# Nos. 24-5610, 24-5626, 24-5641

## In the United States Court of Appeals for the Sixth Circuit

---

UNITED STATES OF AMERICA,
*Plaintiff/Appellee,*

v.

JORGE FLORES, KEVIN TIDWELL, AND JOSE PINEDA-CACERES,
*Defendants/Appellants.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NO. 3:18-CR-293 (HON. ELI J. RICHARDSON)

---

ANSWERING BRIEF FOR THE UNITED STATES

---

ROBERT E. MCGUIRE
  Acting United States Attorney

AHMED A. SAFEEULLAH
  Assistant United States Attorney
  Middle District of Tennessee

MATTHEW K. HOFF
  Deputy Chief, Violent Crime and
  Racketeering Section
  Criminal Division

MATTHEW R. GALEOTTI
  Supervisory Official

SOFIA M. VICKERY
  Attorney, Appellate Section
  Criminal Division
  U.S. Department of Justice
  950 Pennsylvania Ave., N.W.
  Suite 1264
  Washington, DC 20530
  (202) 305-7408
  Sofia.Vickery@usdoj.gov

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................v

STATEMENT REGARDING ORAL ARGUMENT .....................................xi

JURISDICTIONAL STATEMENT ...............................................................1

STATEMENT OF THE ISSUES...................................................................1

STATEMENT OF THE CASE .......................................................................2

    I.       Procedural History.................................................................2

    II.      Statement of Facts ...............................................................4

          A.      April 6, 2016: Murder of Jorge Alejandro Potter Alvarado.............5

          B.      July 31, 2016: Murder of Liliana Rodriguez and Attempted Murder of Rodrigo Rodriguez..............................................................7

          C.      January 18, 2017: Shooting of Roberto Viera...................9

          D.      February 18, 2017: Shooting of Hector Javier Baca, Hansey Sanchez, and Jorge Luis Antunez-Vasquez......................................10

          E.      May 21, 2017: Murder of Ammerli Garcia-Munoz........................12

          F.      May 27, 2017: Murder of Jesus Alberto Flores and Attempted Murder of Luis Roserio....................................................14

          G.      September 24, 2017: Murder of Arling Laines ................................15

          H.      Other Crimes ........................................................................18

    III.     Rulings Under Review.......................................................20

SUMMARY OF THE ARGUMENT ...........................................................20

ARGUMENT ................................................................................................23

    I.       Ample evidence supported Tidwell's convictions. ...................23

          A.      Background ...........................................................................23

B.        Standard of Review ................................................................24

C.        Argument ...............................................................................25

        1.      The evidence proved the existence of an enterprise. ..........26

        2.      Tidwell's challenge to witness credibility is meritless. ........30

        3.      The evidence sufficiently proved Tidwell's guilt for the VICAR convictions. .........................................................31

        4.      The jury's verdict was not against the manifest weight of the evidence. ....................................................................33

II.     The district court did not plainly err by proceeding with jury selection after prospective jurors' comments on MS-13. ..........................34

    A.        Background ............................................................................34

    B.        Standard of Review ................................................................37

    C.        Argument ...............................................................................39

III.    The district court evidentiary rulings were correct and do not warrant reversal. ................................................................................42

    A.        Background ............................................................................42

    B.        Standards of Review ..............................................................46

    C.        Tidwell's Claims .....................................................................48

        1.      The admission of Detective Betts's expert testimony was proper and not plainly erroneous. ..................................48

        2.      The admission of co-conspirator statements was proper and not plainly erroneous. ...........................................50

        3.      Any error did not affect Tidwell's substantial rights and does not warrant reversal under the fourth plain-error prong. ..........................................................................51

    D.        Pineda-Caceres's Claim ........................................................53

          1.      The district court properly exercised its discretion in excluding extrinsic evidence of Baca's jail conduct............53

          2.      Any error was harmless. ........................................54

IV.    The district court correctly denied the motion for a mistrial after a co-defendant pleaded guilty.......................................................55

    A.    Background ...............................................................56

    B.    Standard of review ...................................................58

    C.    Argument..................................................................58

V.    The district court correctly denied Flores's motion to suppress evidence recovered from the Priest Woods residence pursuant to a search warrant.............................................................................60

    A.    Background ...............................................................61

    B.    Standard of Review ..................................................63

    C.    Argument..................................................................64

          1.      The police officers conducted a valid protective sweep. ..................................................................64

          2.      The good-faith exception to the exclusionary rule applies...................................................................67

CONCLUSION .................................................................................68

CERTIFICATE OF COMPLIANCE.................................................69

DESIGNATION OF DISTRICT COURT DOCUMENTS .......................70

# TABLE OF AUTHORITIES

## Cases

*Boyle v. United States,*
556 U.S. 938 (2009) ........................................................................26

*Davis v. United States,*
564 U.S. 229 (2011) ........................................................................67

*Diaz v. United States,*
602 U.S. 526 (2024) ........................................................................49

*Hudson v. Michigan,*
547 U.S. 586 (2006) ........................................................................67

*Lockhart v. McCree,*
476 U.S. 162 (1986) ........................................................................39

*Maryland v. Buie,*
494 U.S. 325 (1990) ........................................................................64

*Reynolds v. Bagley,*
498 F.3d 549 (6th Cir. 2007) ...........................................................41

*Ross v. Oklahoma,*
487 U.S. 81 (1988) ..........................................................................39

*Skilling v. United States,*
561 U.S. 358 (2010) ........................................................................39

*United States v. Adams,*
583 F.3d 457 (6th Cir. 2009) .............................................63, 64, 67

*United States v. Adams,*
722 F.3d 788 (6th Cir. 2013) ..................................................... 48, 54

*United States v. Anderson,*
67 F.4th 755 (6th Cir. 2023) ...........................................................24

*United States v. Bailey,*
No. 19-2280 et al., 2022 WL 2444930 (6th Cir. July 5, 2022) ...................27

*United States v. Baker*,
No. 24-1242, 2025 WL 342862 (9th Cir. Jan. 30, 2025) ...............................................42

*United States v. Barrientos*,
758 F.2d 1152 (7th Cir. 1985) ......................................................................................58

*United States v. Bass*,
315 F.3d 561 (6th Cir. 2002) ........................................................................................65

*United States v. Bavers*,
787 F.2d 1022 (6th Cir. 1985) ......................................................................................59

*United States v. Biggs*,
70 F.3d 913 (6th Cir. 1995) ..........................................................................................65

*United States v. Blitch*,
622 F.3d 658 (7th Cir. 2010) ........................................................................................40

*United States v. Bond*,
22 F.3d 662 (6th Cir. 1994) ..........................................................................................30

*United States v. Braxton*,
No. 20-1491 et al., 2022 WL 910571 (6th Cir. Mar. 29, 2022) ...................................41

*United States v. Campbell*,
86 F. App'x 149 (6th Cir. 2004) ...................................................................................46

*United States v. Craig*,
953 F.3d 898 (6th Cir. 2020) ........................................................................................53

*United States v. Darwich*,
337 F.3d 645 (6th Cir. 2003) ........................................................................................51

*United States v. Dominguez Benitez*,
542 U.S. 74 (2004) ........................................................................................................47

*United States v. Farris*,
733 F. App'x 237 (6th Cir. 2018) .................................................................................38

*United States v. Fields*,
763 F.3d 443 (6th Cir. 2014) ........................................................................................29

*United States v. Fowler,*
   535 F.3d 408 (6th Cir. 2008) ...................................................................25

*United States v. Fugate,*
   599 F. App'x 564 (6th Cir. 2014) .............................................................67

*United States v. Garrison,*
   888 F.3d 1057 (9th Cir. 2018) ..................................................................58

*United States v. Gills,*
   702 F. App'x 367 (6th Cir. 2017) .............................................................28

*United States v. Gold Unlimited, Inc.,*
   177 F.3d 472 (6th Cir. 1999) ....................................................................46

*United States v. Guzman,*
   450 F.3d 627 (6th Cir. 2006) ....................................................................39

*United States v. Hinojosa,*
   67 F.4th 334 (6th Cir. 2023) .....................................................................30

*United States v. Johnson,*
   440 F.3d 832 (6th Cir. 2006) ....................................................................48

*United States v. Kechego,*
   91 F.4th 845 (6th Cir. 2024) .....................................................................38

*United States v. Knipp,*
   963 F.2d 839 (6th Cir. 1992) ............................................................. 38, 41

*United States v. Knowles,*
   623 F.3d 381 (6th Cir. 2010) ....................................................................46

*United States v. Latouf,*
   132 F.3d 320 (6th Cir. 1997) ....................................................................30

*United States v. Ledbetter,*
   929 F.3d 338 (6th Cir. 2019) ....................................................................49

*United States v. Lopez-Medina,*
   461 F.3d 724 (6th Cir. 2006) ............................................................. 64, 66

*United States v. Lucas,*
    No. 19-6390 et al., 2021 WL 4099241 (6th Cir. Sept. 9, 2021) ...............................52

*United States v. Marcus,*
    560 U.S. 258 (2010) ................................................................................ 47, 51

*United States v. Matthews,*
    31 F.4th 436 (6th Cir. 2022)................................................................... 25, 33

*United States v. McArthur,*
    850 F.3d 925 (8th Cir. 2017) ........................................................................26

*United States v. McClain,*
    444 F.3d 556 (6th Cir. 2005) ........................................................................67

*United States v. Odum,*
    878 F.3d 508 (6th Cir. 2017), *vacated on other grounds*, 586 U.S. 913 (2018)...............26

*United States v. Olano,*
    507 U.S. 725 (1993) ....................................................................................59

*United States v. Parks,*
    278 F. App'x 527 (6th Cir. 2008) .................................................................31

*United States v. Ramamoorthy,*
    949 F.3d 955 (6th Cir. 2020) ........................................................................62

*United States v. Rios,*
    830 F.3d 403 (6th Cir. 2016) ................................................................. 48, 51

*United States v. Robinson,*
    390 F.3d 853 (6th Cir. 2004) ........................................................................47

*United States v. Schreane,*
    331 F.3d 548 (6th Cir. 2003) ........................................................................46

*United States v. Scott,*
    693 F.3d 715 (6th Cir. 2012) ........................................................................53

*United States v. Silvers,*
    129 F.4th 332 (6th Cir. 2025).......................................................................38

*United States v. Smith*,
  27 F. App'x 577 (6th Cir. 2001) ............................................................... 31

*United States v. Stapleton*,
  297 F. App'x 413 (6th Cir. 2008) .............................................................. 60

*United States v. Talley*,
  164 F.3d 989 (6th Cir. 1999) .................................................................... 31

*United States v. Tocco*,
  200 F.3d 401 (6th Cir. 2000) .................................................................... 50

*United States v. Trice*,
  966 F.3d 506 (6th Cir. 2020) .................................................................... 64

*United States v. Tsarnaev*,
  595 U.S. 302 (2022) ......................................................................... 39, 41

*United States v. Volkman*,
  797 F.3d 377 (6th Cir. 2015) .................................................................... 24

*United States v. Vonner*,
  516 F.3d 382 (6th Cir. 2008) (en banc) ................................................. 47, 52

*United States v. Walker*,
  1 F.3d 423 (6th Cir. 1993) ....................................................................... 58

*United States v. Wandahsega*,
  924 F.3d 868 (6th Cir. 2019) .................................................................... 58

*United States v. Warman*,
  578 F.3d 320 (6th Cir. 2009) .............................................................. 50, 51

*United States v. Woods*,
  14 F.4th 544 (6th Cir. 2021) ............................................................... 24, 25

*United States v. Xu*,
  114 F.4th 829 (6th Cir. 2024) ................................................................... 49

*United States v. Young*,
  847 F.3d 328 (6th Cir. 2017) .................................................................... 54

*Utah v. Strieff,*
    579 U.S. 232 (2016) ...........................................................................67

*Wilson v. Morgan,*
    477 F.3d 326 (6th Cir. 2007) ............................................................65

**Statutes, Rules, and Constitutional Provisions**

U.S. Const. amend. VI ..........................................................................39

18 U.S.C. § 922 .......................................................................................3

18 U.S.C. § 924 .......................................................................................3

18 U.S.C. § 1512 .....................................................................................3

18 U.S.C. § 1519 .....................................................................................3

18 U.S.C. § 1959 ................................................................................. 2, 3

18 U.S.C. § 1961 ...................................................................................26

18 U.S.C. § 1962 .....................................................................................2

18 U.S.C. § 3231 .....................................................................................1

21 U.S.C. § 846 .......................................................................................3

21 U.S.C. § 841 .......................................................................................3

28 U.S.C. § 1291 .....................................................................................1

Fed. R. Crim. P. 52 ..............................................................................38

Fed. R. Evid. 608 ..................................................................................53

Fed. R. Evid. 704 ..................................................................................49

Fed. R. Evid. 801 ..................................................................................50

**STATEMENT REGARDING ORAL ARGUMENT**

The government does not oppose the scheduling of oral argument and defers to

the Court's judgment on whether argument would aid its decisional process.

## JURISDICTIONAL STATEMENT

Defendants Jorge Flores, Kevin Tidwell, and Jose Pineda-Caceres (collectively, "Defendants") appeal their judgments of conviction. The district court (Richardson, J.) had jurisdiction under 18 U.S.C. § 3231. The judgment for Flores was entered on June 28, 2024, Judgment, R.756, #7687; the judgment for Tidwell was entered on July 3, 2024, Judgment, R.768, #7777; and the judgment for Pineda-Caceres was entered on July 9, 2024, Judgment, R.773, #7797.[1] Defendants filed timely notices of appeal on July 1, 5, and 10, 2024. Flores NOA, R.760, #7704; Tidwell NOA, R.772, #7795; Pineda-Caceres NOA, R.775, #7810. This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.      Whether sufficient evidence supported Tidwell's convictions for conspiracy and violent crime in aid of racketeering and whether the jury's verdict was against the manifest weight of the evidence.

2.      Whether, when prospective jurors made comments about the MS-13 gang that were followed by additional voir dire and a curative instruction, the district court

---

[1] Unless otherwise noted, citations refer to the district court's docket number ("R") and the PageID number ("#") in case number 3:18-CR-293 (M.D. Tenn.). "App." refers to the government's appendix.

plainly erred by proceeding with jury selection with the same venire or by not declaring a mistrial.

3.      Whether the district court (a) plainly erred in admitting certain expert testimony and co-conspirator statements at trial or (b) abused its discretion in excluding extrinsic evidence about a cooperating witness's conduct in jail.

4.      Whether the district court correctly denied Tidwell's motion for a mistrial after a co-defendant pleaded guilty during trial.

5.      Whether the district court correctly denied Flores's motion to suppress evidence seized pursuant to a search warrant where the probable-cause affidavit relied, in part, on observations made during a protective sweep of a residence.

## STATEMENT OF THE CASE

### I.    Procedural History

Following an 18-day jury trial, Defendants were convicted of conspiring to conduct or participate in the affairs of the MS-13 enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1962(d). Flores Verdict, R.573, #2793; Tidwell Verdict, R.571, #2783; Pineda-Caceres Verdict, R.575, #2815.

Flores was additionally convicted on four counts of conspiring to commit murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) ("VICAR murder conspiracy"); three counts of murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) ("VICAR murder"); three counts of attempted murder in aid of

racketeering, in violation of 18 U.S.C. § 1959(a)(5) ("VICAR attempted murder"); seven counts of using, brandishing, and discharging a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); obstructing justice, in violation of 18 U.S.C. § 1512(c); destroying evidence, in violation of 18 U.S.C. § 1519; two counts of possessing a firearm as a convicted felon, in 18 U.S.C. § 922(g)(1); conspiring to distribute 500 or more grams of cocaine and marijuana, in violation of 21 U.S.C. § 846; possessing with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1); and possessing a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c).  R.573, #2794-2803.

Tidwell was additionally convicted on two counts of VICAR murder conspiracy; two counts of VICAR murder; VICAR attempted murder; three counts of using, brandishing, and discharging a firearm during and in relation to a crime of violence; and possessing a firearm as a convicted felon.  R.571, #2784-2787.

Pineda-Caceres was additionally convicted of VICAR murder conspiracy, two counts of VICAR murder; using, brandishing, and discharging a firearm during and in relation to a crime of violence; and conspiring to distribute 500 or more grams of cocaine and marijuana.  R.575, #2816-2818.

The district court sentenced Flores to life plus 65 years' imprisonment, Judgment, R.756, #7689; Tidwell to life plus 30 years' imprisonment, Judgment, R.768, #7779; and Pineda-Caceres to 50 years' imprisonment, Judgment, R.773, #7799.  These consolidated appeals followed.

## II.  Statement of Facts

Defendants Flores (nicknamed "Peluche"), Tidwell (nicknamed "Miklo"), and Pineda-Caceres (nicknamed "Demente") were members of MS-13, also known as La Mara Salvatrucha, a criminal gang with leadership in El Salvador.  Trial Tr., R.605, #4015, 4018, 4022; Trial Tr., R.606, #4330, 4355-4356, 4374-4375; Trial Tr., R.607, #4485-4486; App. 12 (chart with names and nicknames).  MS-13 operates subsets called "cliques" in various geographical areas.  R.605, #4019-4020; R.606, #4358-4359.  Defendants were members of the Thompson Place Locos Salvatrucha (TPLS) clique in Nashville, Tennessee.  R.606, #4354; R.607, #4480, 4485-4486.

MS-13 promotes itself as the "most violent" gang.  R.605, #4017.  Gang members are expected to follow certain rules, including attending weekly meetings called "misas," selling illegal drugs to earn money for the gang, and paying dues.  *Id.* at #4031; R.606, #4382; R.607, #4481-4482; Trial Tr., R.610, #5309-5311.  A "core rule[]" is that MS-13 members assault or kill members of rival gangs, who are known as "chavalas."  R.605, #4029-4030, 4033; R.606, #4369.  Gang members who kill a chavala "earn[] their letters," meaning that they are permitted to get an MS-13 tattoo, a mark of respect and recognition within the gang.  R.606, #4366-4367; R.610, #5312-5313.

Between 2014 and 2021, Defendants committed or participated in a number of violent crimes, including murder and attempted murder, and distributed illegal drugs in furtherance of their membership in MS-13.  At trial, the government's evidence included the testimony of multiple cooperating witnesses (including co-conspirators

and former gang members), victims, other eyewitnesses, law enforcement agents, and forensic and firearms experts; surveillance video, recorded calls, and cellphone tracking data; and materials recovered from residences, cars, and crime scene investigations. Defendants did not present a case. The jury found Defendants guilty after hearing evidence of the following facts.

A.    April 6, 2016: Murder of Jorge Alejandro Potter Alvarado

On the night of April 6, 2016, Pineda-Caceres and two other gang members, Francisco Avila (nicknamed "Humilde") and Jose Calderon (nicknamed "JoJo"), set out to earn their letters by killing a chavala. R.606, #4357-4358, 4385-4387; R.607, #4489; App. 12. Pineda-Caceres carried his own revolver; Avila carried a revolver that Pineda-Caceres had given him; and Calderon carried a .45-caliber gun provided by another gang member. R.606, #4387; R.607, #4497-4498; R.610, #5320, 5325. Pineda-Caceres lured the victim, Jorge Alejandro Potter Alvarado, who Pineda-Caceres believed was in the rival Brown Pride gang, by saying that they were going to smoke marijuana. R.606, #4387-4388; R.607, #4610; R.610, #5319; Trial Tr., R.611, #5474. Pineda-Caceres drove the group to an isolated cattle field south of Nashville. R.605, #4121-4122; R.606, #4389. The drive was "[v]ery quiet." R.606, #4389.

When they arrived at the field, Pineda-Caceres, Avila, and Calderon told Alvarado that he was going to die because he was a chavala. R.606, #4390. Alvarado begged for his life, saying that he had a daughter and family, and started to run towards nearby trees. *Id.* at #4392; R.610, #5324-5325. Pineda-Caceres, Avila, and Calderon

opened fire, stopping only after Alvarado screamed in agony. R.606, #4392-4293; R.607, #4500-4503. The next morning, a local farmer found Alvarado's body in his cattle field and called 911. R.605, #4125-4126.

At the scene, police found a trail of blood leading to Alvarado's body, a pipe in Alvarado's pocket, and .45-caliber casings in the field. R.605, #4137-4140, 4146, 4153. A medical examiner later identified entrance gunshot wounds on the back of Alvarado's body and declared his death a homicide, finding that Alvarado had died from massive internal bleeding caused by gunshot wounds. R.610, #5129-5131.

After the murder, Carlos Ochoa (nicknamed "Cabezon"), who was the "First Word" or leader of TPLS, told the group they used too many shooters but ultimately congratulated them for killing a chavala. R.606, #4395; R.610, #5307, 5324. In recognition of the killing, the gang made Pineda-Caceres, Avila, and Calderon full-fledged members, or "homeboys," and initiated them to their new rank with a ritual beating, a practice known within MS-13 as "jumping in." R.605, #4025-4026; R.606, #4361-4363, 4395-4396. And because they had killed a chavala, Pineda-Caceres, Avila, and Calderon earned their letters and were permitted to get an MS-13 tattoo. R.606, #4395-4396; R.610, #5324. At Ochoa's direction, gang members collected the guns used in the murder and threw them into a river. R.607, #4503; R.610; #5326.

B.    July 31, 2016: Murder of Liliana Rodriguez and Attempted Murder of Rodrigo Rodriguez

In the early morning of July 31, 2016, Liliana Rodriguez decided to celebrate her 18th birthday at an after-hours club called La Mansion.[2]  R.605, #4173, 4186-4187.  Her older brother, Rodrigo Rodriguez, drove Liliana and two friends to the club in his black Ford Mustang.  *Id.* at #4174-4175, 4188.  A few hours later, the group left in the same car; Liliana sat in the rear passenger seat behind her brother, who was driving. *Id.* at #4189-4190.  As the group drove down the highway singing to music, they noticed a black Infiniti with tinted windows and heard popping noises like an engine backfiring. *Id.* at #4179-4180, 4190-4191.

Unbeknownst to the birthday group, Pineda-Caceres and other gang members selling illegal drugs inside the club believed that they had seen a chavala.  R.606, #4404-4405; R.610, #5327-5328; R.611, #5347-5348.  Pineda-Caceres left the club in a black Infiniti driven by a member of a different MS-13 clique, intending to kill the supposed rival, who they believed to be in the Mustang.  R.606, #4404, 4406-4407; R.610, #5328; R.611, #5348-5349.  Earlier that day, Avila had given Pineda-Caceres a .40-caliber Smith & Wesson to carry while they sold drugs.  R.606, #4403.

---

[2] References to "Rodriguez," without a first name, are to attempted murder victim Rodrigo Rodriguez.  References to "Liliana" are to murder victim Liliana Rodriguez.

The MS-13 members chased the Mustang down the highway. R.605, #4180, 4190. Pineda-Caceres lowered the passenger seat window and shot at the Mustang. R.606, #4408-4409. Liliana suddenly stopped speaking and slumped over. R.605, #4181, 4191-4192. Rodriguez, who had never been in a gang, pulled off the highway; a passenger called 911. *Id.* at #4181, 4184, 4192. A responding police officer noticed a black Infiniti speeding away from the scene. R.606, #4346-4347.

Liliana was pronounced dead. A medical examiner later declared her death a homicide, finding that she died after a bullet passed through her heart and lungs. Trial Tr., R.608, #4856-4858, 4878. The bullet recovered from her body was consistent with .40-caliber bullets commonly fired from Smith & Wesson guns. *Id.* at #4855; R.610, #5185-5187. Investigators also identified a bullet entry hole on the driver's side of the Mustang. R.605, #4209-4212. The shape of the bullet hole indicated a "90-degree shot," meaning that if the Mustang were in motion, the shooter had been traveling beside it at the same rate of speed. *Id.* at #4210-4211.

After the murder, Pineda-Caceres was happy, believing that he had killed a chavala. R.606, #4408-4409. But when Pineda-Caceres learned that a young woman had died, he worried that he had violated the MS-13 rule against killing women and children. *Id.* at #4409-4410; R.607, #4511-4512; R.611, #5352-5353. Ochoa told the gang members not to talk about the murder so that "the locos of El Salvador," *i.e.,* MS-13 leadership, would not learn that they had broken the rule. R.606, #4410. Sometime later, Ochoa decided that Pineda-Caceres should leave the country to avoid trouble, and

8

several gang members drove him to Texas to cross the border. *Id.* at #4411; R.611, #5353-5354. At Pineda-Caceres's request, Avila buried the gun used in the murder. R.606, #4413-4414.

    C.    <u>January 18, 2017: Shooting of Roberto Viera</u>

In January 2017, the MS-13 gang was seeking revenge for the killing of Luis Lopez (nicknamed "Chino"), a "homeboy" in TPLS. R.606, #4416-4417; App. 12. During a gang meeting, Ochoa announced a "green light," meaning that the gang members should kill anyone responsible for Lopez's death. R.606, #4416-4417. An opportunity arose on January 18, 2017, when Flores and Avila were shopping at Walmart and spotted Roberto Viera (nicknamed "Chico"), who they believed was responsible for Lopez's death. *Id.* at #4417-4419; R.608, #4683; App. 12. Flores and Avila decided to kill Viera. R.606, #4420.

Flores and Avila followed Viera as he drove with a woman and children from Walmart to his apartment. *Id.* at #4420-4421. Once Viera parked, Flores began shooting at Viera's car; after his gun ran out of bullets, Flores continued shooting with Avila's gun. *Id.* at #4422. Viera managed to drive away, and although he suffered several gunshot wounds, Viera survived the shooting. *Id.* at #4422-4423; R.608, #4684.

Viera's vehicle was riddled with bullet holes, and police recovered .45- and .40-caliber casings from the scene of the shooting. Trial Tr., R.601, #3242-3244; R.608, #4683-4684. An expert determined that the .40-caliber casings recovered from the Viera scene were fired by the Smith & Wesson that law enforcement later recovered

from a carjacking for which Avila also had provided his gun. R.601, #3265, 3268, 3291-3292, 3298-3300; R.606, #4424-4425.

After the shooting, in a recorded jail call on February 3, 2017, Flores told Jason Sandoval (nicknamed "Cuervo"), who had been First Word prior to his arrest, that he had "crossed paths" with "the one behind everything" and assured Sandoval that the gang members "know what they have to do." Trial Tr., R.603, #3853-3854; R.611, #5425, 5427; App. 2-3, 5. Sandoval reminded Flores that the "beast has to eat" and is "hungry," meaning that the gang needed to kill more people. R.611, #5428-5429; App. 7.

D.      February 18, 2017: Shooting of Hector Javier Baca, Hansey Sanchez, and Jorge Luis Antunez-Vasquez

In February 2017, gang members saw an opportunity to kill in service of MS-13. Gang member Hector Javier Baca, also known as Hector Javier Venturas (nicknamed "Chamaco"), had stopped attending meetings and the gang suspected that he was cooperating with police. Trial Tr., R.600, #3001; R.607, #4473-4474, 4517; App. 12. MS-13 prohibits cooperation with law enforcement, which is punishable by death. R.605, #4032-4033, 4088-4089. Ochoa ordered a hit on Baca. R.600, #3001-3002.

Early on February 18, Ochoa alerted Flores and Avila that Baca was at the Bola Ocho nightclub. *Id.* at #3002-3003; Trial Tr., R.608, #4671-4672. Baca had been selling drugs at Bola Ocho with two non-gang members, Hansey Sanchez and Jorge Luis Antunez-Vasquez (nicknamed "El Gordo"). R.607, #4526-4529; R.608, #4738.

Although the gang typically did not allow non-member drug dealers in its "territory," the gang made an exception for Sanchez and Antunez-Vasquez because they gave Ochoa cocaine on credit. R.607, #4526-4527; R.608, #4741-4742. Ochoa, who planned to eventually kill Sanchez and Antunez-Vasquez to avoid paying his debt, remarked to the other gang members that it would not matter if they hit Sanchez and Antunez-Vasquez while aiming at Baca. R.600, #3004-3005; R.607, #4527-4528.

Baca, Sanchez, and Antunez-Vasquez left Bola Ocho in a black and white Scion and began driving towards another nightclub to continue selling drugs. R.607, #4528-4529. But on the way, a green Honda driven by Avila pulled alongside the Scion, and Ochoa and Flores, who was wearing a blue Yankees cap, started shooting AK-47s at the Scion. R.600, #3004-3005; R.607, #4529-4530; R.608, #4712. They continued shooting, chasing the Scion into the parking lot of the Island Vibes club. R.600, #3005-3007; R.607, #4531; R.608, #4712-4713. Baca, Sanchez, and Antunez-Vasquez got out of the Scion and escaped on foot. R.607, #4531-4532; R.608, #4715. No one was hit in the exchange of gunfire. R.600, #3007; R.608, #4675.

At the scene, police found panicked nightclub patrons, the Scion riddled with bullet holes and broken windows, bullet holes and broken audio equipment in the Island Vibes club, and numerous cartridge casings. R.601, #3348, 3366; R.608, #4671-4675, 4678. An expert determined that the .45-caliber casing recovered from this shooting was fired by the same gun that fired the .45-caliber casings later found in an abandoned green Honda. R.608, #4735-4737; R.610, #5239-5240.

About a week later, on February 25, 2017, Ochoa again saw Baca, Sanchez, and Antunez-Vasquez at Bola Ocho and wagged his finger at the group. R.607, #4540-4542; R.608, #4675. When Sanchez tried to drive away, a car cut him off, a second vehicle crashed into him, and gang members began to shoot. *Id.* at #4543-4544; R.608, #4726-4728, 4750; R.611, #5365. Sanchez was shot nine times but survived. R.608, #4728-4730. Baca and Antunez-Vasquez, who left in a different car, were uninjured. R.607, #4543-4544; R.608, #4751.

E.    <u>May 21, 2017: Murder of Ammerli Garcia-Munoz</u>

Yet another opportunity to kill for MS-13 arose on May 21, 2017, when Flores, Tidwell, gang member Franklin Pineda-Caceres (nicknamed "Bomba") and others followed Ammerli Garcia-Munoz into the parking lot of the Bola Ocho nightclub. R.600, #2986-2988; Trial Tr., R.602, #3509, 3521-3522; App. 12.[3] The gang members had decided to kill Garcia-Munoz because they believed he was a member of the rival 18th Street gang, *i.e.,* a chavala. R.600, #2986, 2988-2989; R.611, #5368-5369.

Just prior to Garcia-Munoz's murder, Cindy Hernandez approached Tidwell and Flores in the parking lot to ask for a cigarette and overheard them talking about getting

---

[3] References to "Pineda-Caceres," without a first name, are to Defendant Jose Pineda-Caceres. References to "Franklin" are to gang member Franklin Pineda-Caceres.

a gun.[4]  R.608, #4795-4796; R.611, #5367.  Surveillance video captured this interaction.  R.608, #4798-4799.  Minutes later, Flores and Tidwell shot Garcia-Munoz 11 times as he sat in a parked car, killing him.  R.600, #2987-2988; R.606, #4280; R.608, #4865.  A medical examiner ruled his death a homicide.  R.608, #4878-4879.

At the scene, law enforcement found multiple bullet holes in the driver's side of the vehicle in which Garcia-Munoz was shot.  R.601, #3376-3378.  They also recovered 7.62 shell casings and .40-caliber casings.  *Id.* at #3383-3384.  An expert determined that the 7.62 casings found at the scene had been fired by the AK-47 later found in a vehicle driven by Flores.  R.602, #3586-3588; R.606, #4281, 4285-4286.  Cellphone tower data located Tidwell's cellphone in the area at the time of Garcia-Munoz's murder.  Trial Tr., R.609, #5017; Trial Tr., R.612, #5765-5768.

After the murder, Tidwell told Cindy that a man had been killed and he wanted to "kill one more."  R.608, #4802.  Flores remarked that Garcia-Munoz was "of the 18th" and "deserved it" and that Cindy should not tell anyone what she had seen or heard in the parking lot.  R.606, #4303; R.608, #4802.  After Garcia-Munoz's murder, Flores also got an MS-13 tattoo on his back.  R.606, #4307-4308.

---

[4] References to "Hernandez," without a first name, are to gang member and cooperating witness Franklin Hernandez.  References to "Cindy" are to Cindy Hernandez.

F.    May 27, 2017: Murder of Jesus Alberto Flores and Attempted Murder of
      Luis Roserio

On May 27, 2017, Tidwell and Flores killed again.  That night, in a local market,

Tidwell got into an argument with Jesus Alberto, who was buying cigarettes.[5]  R.602,

#3434-3437, 3445, 3469; R.608, #4881.  When they left the store, Jesus Alberto got in

a car driven by Luis Roserio while Tidwell got in a gray F-150 truck driven by Flores.

R.602, #3436, 3447; R.606, #4309.   Surveillance video recorded the F-150 truck

following Roserio's car out of the parking lot.  R.602, #3448.

Roserio and Jesus Alberto drove towards a family party, but the F-150 cut them

off and Tidwell began shooting at them from the front passenger seat.  R.602, #3448-

3451, 3459, 3461.  Jose Alberto told Roserio that he had been shot; Roserio tried, but

was unable, to keep driving.  Id. at #3453.  Roserio unbuckled Jose Alberto's seatbelt

and told him to run.  Id. at #3453-3454.  The men began running together towards the

family party, but Roserio lost sight of Jose Alberto along the way.  Id. at #3454-3455.

When Roserio backtracked, he found Jose Alberto lying in the grass, breathing slowly

and unable to talk.  Id. at #3455-3456.  Jose Alberto died; a medical examiner declared

his death a homicide, caused by a gunshot wound to his abdomen.  Id. at #3538-3539.

---

[5] References to "Flores," without a first name, are to Defendant Jorge Flores.
References to "Jesus Alberto" are to the murder victim Jesus Alberto Flores.

At the scene, law enforcement found the vehicle that Roserio had been driving with bullet holes and two flat tires; officers also recovered 7.62 shell casings and .45-caliber casings. R.601, #3391-3392, 3395-3402. An expert determined that these casings were fired by the AK-47 and Glock pistol later recovered from a vehicle driven by Flores. R.602, #3591-3597; R.606, #4285-4286, 4290. Cellphone tower data located Tidwell's cellphone in the area at the time of the murder. R.609, #5017; R.612, #5770-5775.

A few days later, law enforcement found a burned F-150 truck in a construction site. R.609, #4936-4938, 4940. Police found .45-caliber casings inside the truck, though they were too damaged to make a firearm comparison. *Id.* at #4944-4945; R.610, #5184-5185. In a nearby muddy area, police found a sneaker footprint. R.609, #4948-4949. When Tidwell was arrested the following day, the arresting officer noticed that his white sneakers were stained with dark splotches. R.608, #4818-4819, 4827-4828. Photos of Tidwell after his arrest reveal tattoos of the letters MS on his neck and the number 13 on his stomach and arm. R.602, #3623.

G.    September 24, 2017: Murder of Arling Laines

On September 24, 2017, Flores and Hernandez, who by then were the First and Second Word of TPLS, became concerned that "the new guys were basically outdoing us." R.601, #3322; R.611, #5396, 5399-5400. Earlier that night, gang member Luis Colindres (nicknamed "Listo"), with assistance from Franklin and another member, Oscar Delgado-Flores, had earned his letters in a double homicide by killing a member

15

of the rival 18th Street gang and a witness.  R.601, #3322; R.603, #3689-3690; R.611, #5395-5399; App. 12.  Feeling like they "needed to do something," Flores and Hernandez decided to "[f]ind someone and kill them."  R.611, #5400.  After some discussion, they settled on Arling Laines, who they believed was "playing both sides" by associating with the gang but also hanging out with non-gang members.  *Id.* at #5400-5402.

Flores and Hernandez drove a Toyota to an isolated spot where they met Colindres, Franklin, and Delgado-Flores who dropped off Laines.  R.603, #3701-3702; R.611, #5411-5412, 5417.  Colindres and the other gang members left Laines with Flores, who carried a .45-caliber gun, and Hernandez, who had a .40-caliber gun and a gallon of gasoline.  R.611, #5408-5410, 5412.  Flores ordered Laines into the trunk of the Toyota, and as Laines was climbing inside, Flores and Hernanez started shooting.  *Id.* at #5412-5414.  Hernandez pushed Laines's body fully inside and closed the trunk.  *Id.* at #5414.  But Flores wanted to make sure that Laines was really dead, so he opened the hood and fired a few more shots.  *Id.* at #5414-5415.  Afterwards, Flores flicked something off his shirt at Hernandez, remarking that it might be a piece of brain.  *Id.* at #5415.

Flores and Hernandez drove the Toyota with Laines's body to a wooded area.  R.603, #3705-3706; R.611, #5416.  Hernandez poured gasoline on Laines's body and Flores set the Toyota on fire in order to destroy evidence of the crime.  R.603, #3706-

3707; R.611, #5409.   In the process of lighting the fire, Flores's magazine broke, spilling bullets on the ground, and Flores burned his hand.  R.603, #3708; R.611, #5417-5418.

Meanwhile, surveillance video captured Colindres, Franklin, and Delgado-Flores, the group who had dropped off Laines, waiting in a Waffle House parking lot.  R.603, #3703-3705; R.609, #5022-5023; R.611, #5411.  Once Flores sent coordinates for the pick-up location, the three drove to the wooded area and picked up Flores and Hernandez.   R.603, #3705-3706; R.611, #5418-5419.   Later that night, Flores's girlfriend treated his burn with mayonnaise.  R.606, #4324.

At the scene of the murder, law enforcement recovered .40- and .45-caliber casings.  R.603, #3837.  At the scene of the fire, law enforcement found the burned Toyota with Laines's remains, bullet holes, and .45-caliber casings in the trunk; they also found a magazine spring and unfired .45-caliber ammunition nearby.  *Id.* at #3790-3791, 3806-3809, 3823-3824; R.610, #5111.  An expert later determined that these .45-caliber casings were fired by the same weapon that fired the .45-caliber casings found after the February 2017 shootings of Baca, Sanchez and Antunez-Vasquez.  R.610, #5165-5168, 5173-5174.  The next month, police found a magazine missing a spring inside a vehicle driven by Colindres.  *Id.* at #5220-5221, 5224.  Cellphone tower data located the cellphones of Colindres and Delgado-Flores near the shooting scene, the Waffle House, and the fire scene around the time of the murder.  R.602, #5784-5791.

H.	Other Crimes

On March 15, 2016, Ochoa, then the leader of TPLS, was arrested after fleeing law enforcement and flipping his vehicle into a creek. R.608, #4664-4667; R.610, #5201, 5205, 5307. Inside the vehicle, police found approximately 50 grams of cocaine packaged in individual baggies. R.608, #4667-4669. Gang members regularly got cocaine from Ochoa that they would sell to earn money for the gang. R.606, #4381-4382; R.607, #4481-4482. The following year, gang members continued to discuss selling illegal drugs for the gang, including in Facebook conversations about "kilos" and stopping non-gang members from selling in the gang's territory. R.612, #5696-5697. In a July 2017 text message exchange found on Flores's cellphone, Flores discussed the price of an "eight ball" of cocaine and whether the product would be "hard," "soft," or "bars." *Id.* at #5634, 5639-5643. And in May and June 2018, an informant conducted three controlled purchases of cocaine from Sandoval with gross weights of approximately 57, 84, and 86 grams. R.608, #4756-4758, 4761-4763.

On June 1, 2017, police arrested Tidwell when he crashed his vehicle attempting to evade a traffic stop. R.608, #4818-4820. Police found a .38-caliber revolver in Tidwell's pocket. *Id.* at #4822-4825.

On August 4, 2017, officers tried to arrest Flores, but he fled in a white Toyota Camry with a scratch on the back bumper. R.602, #3541-3546; R.606, #4297-4298. Later that day Flores directed Avila to a parking garage and asked him to remove "dirty" guns from the Camry, meaning guns that had been used in a hit. R.611, #5374. But

when Avila arrived at the garage, the authorities were already there.  R.602, #3546-3548; R.611, #5375.  Inside the Camry, investigators found an AK-47 rifle loaded with 30 rounds, a Glock .45 handgun loaded with nine rounds, additional ammunition, body armor, a digital scale, and a navy blue or black Yankees cap.  R.602, #3601; R.606, #4285-4288, 4290-4297.  About a month earlier, Flores was recorded placing a rifle inside a white Camry with a scratch on the back bumper.  *Id.* at #4310, 4314-4316.  In a later recorded phone call, Flores complained that "he almost got caught" and "they took everything," including his "tools," which was a code word for guns.  R.611, #5378-5380.

On October 4, 2017, police arrested Flores outside of a home on Priest Woods Drive.  R.603, #3873-3874.  Flores, his girlfriend, and their infant daughter lived in a downstairs bedroom of that residence, which belonged to Hernandez's sister.  R.606, #4317-4320.  Photos of Flores after his arrest reveal tattoos with the letters TPLS on his stomach and arm, an MS tattoo on his back, and scarring on his right hand.  R.602, #3621; R.609, #5029.

After arresting Flores, police conducted a protective sweep of the residence during which they observed a Glock drum magazine and an AR-15.  3:19-cr-42, Hearing Tr., R.59, #232-234 (M.D. Tenn.).  Police then obtained and executed a search warrant for the Priest Woods home.  R.603, #3873-3874.  Police seized a loaded handgun from a bassinette in Flores's bedroom and the AR-15 from the downstairs bathroom.  R.603, #3884-3885; R.606, #4324; R.609, #4954-4955.  Police also found a digital scale with

19

white residue, ammunition, approximately 70 grams of cocaine, approximately 70 grams of marijuana, and a cellphone. R.603, #3883; R.609, #4958-4959, 4962-4965. In an upstairs bedroom, police found tattoo equipment and a "TPLS" tattoo stencil. R.603, #3888-3889.

On October 10, 2017, police arrested Pineda-Caceres. R.602, #3560; R.612, #5644-5645. Photos of Pineda-Caceres after his arrest reveal tattoos of "MS" on his stomach, "13" on his legs, and "TPLS" on his chest and arm. R.602, #3622.

## III. Rulings Under Review

The rulings under review are identified in the argument on each issue.

## SUMMARY OF THE ARGUMENT

1.      Sufficient evidence supported the jury's determination that Tidwell conspired to participate in the affairs of an enterprise through a pattern of racketeering activity. The evidence amply proved that MS-13 was an enterprise. The gang's common purpose was to preserve and protect the gang's power, territory, reputation, and profits by committing acts of violence; gang members associated with each other according to the gang's structure and rules; and the gang had longevity. The jury could readily credit the testimony of cooperating co-conspirators and other government witnesses; credibility determinations are at the heart of the jury's factfinding role. There also was ample evidence of Tidwell's involvement in the murder of Garcia-Munoz, the murder of Jesus Alberto, and the attempted murder of Roserio. The district court

properly denied Tidwell's claim that his conviction was against the manifest weight of the evidence.

2. The district court did not err in proceeding with jury selection or by not declaring a mistrial after prospective jurors shared their views on MS-13. After hearing that the case involved murders and crime scene photos and perceiving that defense counsel might equate MS-13 with charitable organizations, one prospective juror shared that they had trouble sleeping the prior night and could not be convinced that MS-13 is a "benevolent organization." That prospective juror and two other prospective jurors who shared that view were dismissed for cause. Subsequent voir dire made clear that no remaining venireperson had this potential bias. The court's curative instruction to the venire and later instructions to the impaneled jury confirm that Tidwell was tried by an impartial jury.

3. The district court did not plainly err in admitting expert testimony on the inner workings of MS-13. Nor did the court plainly err in admitting co-conspirator statements under Federal Rule of Evidence 801(d)(2)(E) where the evidence established that the statements were made in furtherance of the conspiracy. In any event, Tidwell cannot show that any error affected his substantial rights given the substantial independent evidence of his guilt.

The district court also properly exercised its discretion in excluding evidence that a cooperating government witness threatened jail employees, because the evidence had no impeachment value and concerned a collateral issue. In any event, any error was

harmless given other evidence corroborating the cooperating witness's testimony and the overwhelming evidence of Pineda-Caceres's guilt.

4.    Following a co-defendant's mid-trial guilty plea, the district court properly denied Tidwell's motion for a mistrial. The court's instructions to the jury—to pay no attention to the co-defendant's absence, not to speculate about the reason for the absence, and to assess each defendant's guilt individually—ensured that no prejudice resulted from the co-defendant's absence.

5.    The district court correctly denied Flores's motion to suppress evidence recovered from a residence pursuant to a search warrant where the probable-cause affidavit was based, in part, on a Glock drum magazine and AR-15 that police observed during a protective sweep of the residence. Flores does not dispute the district court's finding that articulable facts justified the initial warrantless entry for a protective sweep, including that authorities had a warrant to arrest Flores for murder and information that other dangerous individuals might be present and that the front door was closed after Flores exited the house. Those same facts permitted police to sweep downstairs, a place that individuals might be hiding, regardless of whether that portion of the sweep occurred before or after police arrested Hernandez and Franklin in an upstairs bedroom. And even if the protective sweep was invalid, suppression is not warranted because the good-faith exception to the exclusionary rule applies in these circumstances.

## ARGUMENT

## I.   Ample evidence supported Tidwell's convictions.

Tidwell contends (Br.49-57) that the evidence at trial did not prove the existence of a RICO enterprise; that some witnesses were not credible; and that the evidence does not support his VICAR convictions for the May 21 murder of Ammerli Garcia-Munoz or the May 27 murder of Jesus Alberto Flores and attempted murder of Luis Roserio. He contends (Br.57) that the district court should have entered judgment of acquittal or, in the alternative, ordered a new trial. These claims lack merit. The evidence amply supports the jury's verdict.

### A.   Background

During trial, counsel for Tidwell moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the government's case depended on the testimony of cooperators that he viewed as not credible. Trial Tr., R.613, #5882. The district court reserved decision. *Id.* at #5884-5885. Following trial, Tidwell moved for a new trial under Rule 33, arguing that the evidence did not show an enterprise, that the government witnesses were not credible, and that there was insufficient proof of his involvement in the May 21 and May 27 shootings. Motion, R.632, #6311-6317.

The district court denied the motions. Hearing Tr., R.730, #7567. First, the court found "pretty strong" evidence that MS-13 was an enterprise with a common purpose and that gang members committed acts of violence "to promote the interests of MS-13." *Id.* at #7553-7556. Second, the court noted the "prerogative of the jury"

to believe the witnesses who testified. *Id.* at #7557. Third, the court found sufficient evidence of Tidwell's involvement in the shootings on May 21 and 27, 2017. With respect to the May 21 murder of Garcia-Munoz, the court cited Tidwell's incriminating admissions to co-conspirators and "very strong" circumstantial evidence. *Id.* at #7562-7563. The court also concluded that even if Tidwell were not the shooter, he would be guilty as an aider and abettor. *Id.* at #7563. With respect to the May 27 murder of Jesus Alberto and attempted murder of Roserio, the court found "strong evidence" of Tidwell's motive; noted that Roserio "flat-out identified Mr. Tidwell as the shooter"; and cited corroborating evidence that Tidwell followed the victims. *Id.* at #7563-7564. Finally, acting as the "13th juror," the district court determined that Tidwell's conviction was not against the manifest weight of the evidence. R.730, #7518, 7543, 7555-7557, 7562-7563.

B.   <u>Standard of Review</u>

This Court reviews challenges to the sufficiency of the evidence de novo. *See United States v. Woods*, 14 F.4th 544, 551 (6th Cir. 2021). The Court "ask[s] whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Anderson*, 67 F.4th 755, 768 (6th Cir. 2023) (per curiam) (quotations omitted). This is a "very heavy burden" for a defendant, *id.* (quotations omitted), and "circumstantial evidence alone can defeat a sufficiency challenge," *United States v. Volkman*, 797 F.3d 377, 390 (6th Cir. 2015). When a defendant appeals the

denial of a Rule 33 motion, this Court does not reweigh the evidence, and "review is limited to determining whether [the trial court's ruling] was a clear and manifest abuse of discretion." *United States v. Matthews*, 31 F.4th 436, 449 (6th Cir. 2022) (quotations omitted).

C.    Argument

Tidwell's challenge focuses on his RICO conspiracy and VICAR convictions. A RICO conspiracy charge "requires proof that the defendant intended to further an endeavor which, if completed, would satisfy all of the elements of a substantive [RICO] criminal offense [and] it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *United States v. Fowler*, 535 F.3d 408, 421 (6th Cir. 2008) (quotations omitted). A substantive RICO charge, in turn, requires proof of "(1) the existence of an enterprise which affects interstate or foreign commerce; (2) the defendant's association with the enterprise; (3) the defendant's participation in the conduct of the enterprise's affairs; and (4) that the participation was through a pattern of racketeering activity." *Id.* at 418.

A VICAR conviction requires proof that "(1) that the [o]rganization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that the defendant committed the alleged crime of violence, and (5) that his general purpose in doing so was to maintain or increase his position in the enterprise." *Woods*, 14 F.4th at 555 (quotations omitted).

Particularly when viewing the evidence in the light most favorable to the verdict, none of Tidwell's claims has merit. The district court correctly denied his motions for a judgment of acquittal and a new trial.

### 1. The evidence proved the existence of an enterprise.

Tidwell claims (Br.52) that the evidence was insufficient to establish "a cohesive RICO enterprise" because the conspirators "engaged in independent criminal conduct." That argument lacks merit.

a. The RICO statute defines an "enterprise" to include "any individual, partnership, corporation, association, or other legal entity," as well as "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). For an association-in-fact enterprise to qualify as a RICO enterprise, it "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). Those requirements were satisfied here.

First, the evidence showed that MS-13 had a common purpose: to preserve and protect the gang's power, territory, reputation, and profits through the use of violence, including assaults and murder. *See United States v. Odum*, 878 F.3d 508, 516-17 (6th Cir. 2017) (citing this purpose of street gang in connection with RICO enterprise element), *vacated on other grounds*, 586 U.S. 913 (2018); *United States v. McArthur*, 850 F.3d 925, 934 (8th Cir. 2017) (similar). Trial testimony established that MS-13 held itself out as the

"most violent" gang, R.605, #4017; a core rule required members to murder rival gang members, *id.* at #4029-4030, 4033; R.606, #4369, which the gang rewarded and recognized with MS-13 tattoos, R.606, #4366-4367; R.610, #5312-5313; and members were required to sell illegal drugs to earn money for the gang, R.606, #4382. The evidence of the many shootings in this case, most of which targeted rival gang members or drug dealers perceived to be infringing on MS-13 territory, corroborated that testimony. *See* pp. 5-17, *supra*.

Gang members also shared firearms used in the shootings; for instance, shooters in the Alvarado murder, the murder of Liliana and attempted murder of Rodriguez, and the attempted murder of Viera used guns provided by other gang members. *E.g.,* R.606, #4403, 4422; R.607, #4497-4498; R.610, #5320, 5325. And gang members cooperated to avoid detection, including by disposing of firearms and burning vehicles involved in murders. *E.g.,* R.603, #3706-3707; R.606, #4413-4414 (gun in Liliana and Rodriguez shooting); R.607, #4503 (gun in Alvarado shooting); R.609, #4937-4938, 4940 (burned F-150); R.611, #5409 (burned Toyota). They also retaliated on behalf of one another, such as by shooting Viera—a person believed to be responsible for a fellow gang member's murder. *E.g.,* R.606, #4418. *See, e.g., United States v. Bailey,* No. 19-2280 et al., 2022 WL 2444930, at *3 (6th Cir. July 5, 2022) (finding sufficient evidence of an association-in-fact enterprise based on similar coordination). All these actions furthered MS-13's common purpose.

Second, MS-13 gang members associated with each other according to the gang's structure and rules. The trial testimony showed that members attended weekly "misas" to discuss gang business, followed leadership commands, paid dues, submitted to beatings to get "jumped" into a higher rank, and sought approval for MS-13 tattoos. *E.g.,* R.605, #4030-4033. The evidence in this case of the "green lights" (hits) issued at misas, gang leaders' decisions on weapons and tattoos, and the jumping in rituals corroborated that testimony. *See* pp. 6, 9, 10, 13, 15-16, *supra*.

Third, the gang had longevity. MS-13 originated decades ago, operated in the Nashville area for many years, and persisted even after law enforcement arrested some of its leaders. *See, e.g.,* R.605, #4014-4016; *see also* pp. 5, 18, *supra*. This was "ample time in which to commit multiple acts of racketeering." *United States v. Gills*, 702 F. App'x 367, 374 (6th Cir. 2017). In sum, a rational jury could find that MS-13 was an association-in-fact enterprise.

      b.     Tidwell's arguments to the contrary are unavailing.

Tidwell first suggests (Br.51) that TPLS was not a "legitimate 'clique' of MS-13." But the trial evidence showed that MS-13 operates cliques in different areas, R.605, #4019-4020; R.606, #4358-4359; that TPLS followed the structure and rules of MS-13, R.606, #4356-4357; that TPLS communicated with and paid dues to MS-13 leadership in El Salvador, *id.* at #4358-4360; and that TPLS members used MS-13 hand signs and were rewarded with MS-13 tattoos, *id.* at #4367-4368; R.610, #5312.

Tidwell also observes (Br.51) that gang members occasionally deviated from the gang's rules, for example, by committing murders without advance permission. But killing chavalas was a core rule; no advance permission was required. R.605, #4033; R.611, #5396. And even if adherence to the rules was imperfect, the fact that strict rules existed—and were enforced—supports the jury's finding that MS-13 was an enterprise. For instance, after Pineda-Caceres violated the MS-13 rule that prohibited killing women and children, he left the country to avoid trouble. R.606, #4409-4411. The gang also punished Avila for selling drugs sourced from outside the clique, personally using drugs, and losing the gang's property. *Id.* at #4369, 4381. And the gang ordered a hit on Baca and tried to kill him, after they suspected him of cooperating with law enforcement. R.600, #3001-3002.

Finally, Tidwell claims (Br.51-52) that gang members murdered Alvarado, Jesus Alberto, and Laines for their own benefit. But the jury's finding that these acts furthered the gang's purpose is well supported by evidence that these victims were murdered because of suspected affiliation with rival gangs or perceived disrespect to MS-13. R.602, #3469; R.606, #4390; R.611, #5402. *Cf. United States v. Fields*, 763 F.3d 443, 468 (6th Cir. 2014) (That "conspirators formed smaller groups to carry out their business is unavailing; the mere fact that a conspiracy can be subdivided . . . does not mean that multiple conspiracies existed." (quotations omitted)). There also is ample evidence that the shooters gained respect and recognition from the gang for these murders, including by earning MS-13 tattoos. R.606, #4395-4396; R.610, #5324.

2. <u>Tidwell's challenge to witness credibility is meritless.</u>

Tidwell's general challenge (Br.52-54) to the credibility of three cooperating gang members (Avila, Baca, and Hernandez) and two other witnesses (Salgado and Cindy) does not withstand scrutiny. "The credibility of witnesses is exclusively the province of the jury," *United States v. Bond*, 22 F.3d 662, 667 (6th Cir. 1994), and the jury's resolution of such questions is "entitle[d]" to "special deference," *United States v. Latouf*, 132 F.3d 320, 330-31 (6th Cir. 1997) (quotations omitted). On sufficiency review, arguments about witness credibility are "irrelevant," and the Court accepts testimony supporting a guilty verdict even if that testimony "contradict[s]" other evidence or may be "self-serving." *United States v. Hinojosa*, 67 F.4th 334, 341 (6th Cir. 2023) (quotations omitted); *see also id.* at 340 (on sufficiency review, court "must resolve any evidentiary conflicts or credibility dispute in a manner that favors the government's version of the facts").

Tidwell argues (Br.52) that the jury should not have believed these witnesses. But the jury was well-informed of Tidwell's credibility claims. Defense counsel used cross-examination to impeach these witnesses, highlighting their incentives to lie, prior bad acts, and prior inconsistent statements. *E.g.,* R.600, #3027, 3034 (Avila); R.608, #4806-4811, 4816 (Cindy); R.602, #3491 (Salgado). Tidwell focused on those arguments in closing, telling the jury that Avila "lied to officers many times"; that Baca had "gotten away with . . . even mass murder"; and that Hernandez expected to be released despite pleading guilty to three murders. R.613, #5946-5948. The district

court also charged the jury on issues of credibility, noting that the jury could consider a witness's incentive to lie. Trial Tr., R.614, #6040 (suggesting that jury consider whether "the witness had any relationship to the government or the defendant," "anything to gain or lose from the case," or "reason for testifying that might cause the witness to lie"). But the jury returned guilty verdicts. And "[i]t is for [jurors] and not for appellate courts to say that a particular witness spoke the truth or fabricated a cock-and-bull story." *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999) (quotations omitted).

### 3. The evidence sufficiently proved Tidwell's guilt for the VICAR convictions.

Tidwell contends (Br.54-57) that the evidence is insufficient to sustain his VICAR convictions associated with the murders of Garcia-Munoz and Jesus Alberto and the attempted murder of Roserio, because "there was insufficient evidence to show [ ] Tidwell murdered, conspired or aided and abetted any murders." Tidwell is wrong.

With respect to the May 21, 2017 murder of Garcia-Munoz, three witnesses testified about co-conspirator statements that Tidwell and Flores shot Garcia-Munoz. R.600, #2988; R.607, #4546-4547; R.611, #5367-5368. Tidwell is incorrect (Br.55-56) in suggesting that direct eyewitness testimony is required to sustain his conviction. *See United States v. Parks*, 278 F. App'x 527, 536 (6th Cir. 2008) ("[T]his Court has never held that eyewitness evidence is needed to secure a conviction."); *United States v. Smith*, 27 F. App'x 577, 580 (6th Cir. 2001) (noting that even "[t]he uncorroborated testimony of an accomplice may support conviction").

Moreover, significant circumstantial evidence established Tidwell's guilt. Cindy testified that, minutes before the murder, she saw Tidwell and Flores in the parking lot and overheard them talking about a gun; her testimony was corroborated by surveillance video. R.608, #4795-4796, 4798-4799; R.611, #5367. Tidwell and Flores also made statements and took actions reflecting their guilt; for example, Tidwell said that he wanted to "kill one more," Flores said that Cindy should not tell anyone what she had heard or seen, and Flores got an MS-13 tattoo after the murder. R.606, #4303, 4307-4308; R.608, #4802. Independent physical evidence also corroborated Tidwell's guilt. Firearms experts determined that casings recovered from the murder scene were fired by a weapon later recovered from a car driven by Flores, R.602, #3586-3588; R.606, #4281, 4285-4286, and cellphone tower data placed Tidwell in the area at the time of the murder, R.609, #5017; R.612, #5765-5768.

With respect to the May 27, 2017 murder of Jesus Alberto and attempted murder of Roserio, Roserio testified that he was "certain" and had "no doubt" that Tidwell, whom he identified in open court, was the shooter. R.602, #3449-3451, 3459, 3461, 3471. Tidwell is incorrect (Br.56) that police "helped" Roserio with that identification. When asked on cross-examination, Roserio actually testified that police "didn't help me as to identify him" but did "help" him "calm down" after the shooting "because of what I had just gone through." R.602, #3471.

Significant circumstantial evidence also supported Tidwell's guilt for these crimes. Surveillance video showed the gray F-150 truck follow Jesus Alberto and

Roserio out of the parking lot. R.602, #3436, 3447-3448; R.606, #4309. Firearms experts determined that the casings from the shooting had been fired by weapons later recovered from a vehicle driven by Flores. R.602, #3591-3597; R.606, #4285-4286, 4290. Cellphone tower data placed Tidwell's cellphone in the area at the time of the murder. R.609, #5017; R.612, #5770-5775. And after the shooting, police found a muddy footprint next to the burned F-150 that was consistent with the stained shoes Tidwell was wearing when he was arrested. R.608, #4827-4828; R.609, #4948-4949.

Particularly when considered as a whole and in the light most favorable to the jury's verdict, the evidence was more than sufficient to support Tidwell's convictions.

### 4. The jury's verdict was not against the manifest weight of the evidence.

Finally, Tidwell suggests (Br.33, 57) that the district court erred in denying his motion for a new trial because his convictions were against the manifest weight of the evidence. The district court correctly explained that it may "bring in its own perspective" as the thirteenth juror. R.730, #7518. In that capacity, the district court did not manifestly abuse its discretion in concluding that the evidence regarding MS-13 satisfied the elements of an enterprise; that it had "no problem with buying" the trial witness's testimony; and that Tidwell's involvement in the murders was established by cooperator testimony and other corroborating evidence. *Id.* at #7543, 7555-7557, 7562-7563. *See Matthews*, 31 F.4th at 449 (finding no abuse of discretion where district court applied the correct standard and considered similar evidence).

## II. The district court did not plainly err by proceeding with jury selection after prospective jurors' comments on MS-13.

Tidwell contends (Br.35-38) that his "constitutional rights" were violated because the district court failed "to address concerns about juror safety and bias" by not "empanel[ing] a new venire" or "investigat[ing] properly" after prospective jurors commented about MS-13. His claim is meritless.

### A. Background

Over three days, the district court called two groups of venirepersons for voir dire and seated 12 jurors and four alternates from those groups. Trial Tr., R.640, #7017. With each group, the district court read a summary of the charges and asked about prior familiarity with topics likely to be part of the case, including the MS-13 gang. Trial Tr., R.638, #6381-6388, 6432; Trial Tr., R.639, #6826-6831, 6864. In both groups, several venirepersons indicated that they had heard of MS-13, but all venirepersons confirmed that they could set aside any prior knowledge and "decide the case based just on the evidence and the law." R.638, #6432-6437; R.639, #6866. The government then asked questions of each group, including if it would be problematic to see crime-scene and autopsy photos. R.638, #6500; R.640, #6904. Counsel for each defendant also asked questions of each group of venirepersons.

Tidwell's challenge stems from comments by Prospective Juror 40 in the first venire group. At the end of the first day, counsel for Flores posed a series of open-ended questions about organizations like the Girl Scouts, fraternities, and church.

R.638, #6574-6580.  On the second morning, counsel for Flores continued that line of questioning, asking for opinions about whether a group is responsible for the actions of individual members.  R.639, #6637-6645.  After hearing those questions, Prospective Juror 40 stated, "I literally could not sleep last night" because "once the lawyers started talking about organizations like fraternities and the Girl Scouts, I got the feeling that they're going to possibly, during this trial, bring up that MS-13 is comparable to those kinds of organizations."  *Id.* at #6649.  Prospective Juror 40 then shared, "[M]y belief is that they are not a benevolent organization of social club nature" and that "their organization . . . is not in the best public interest."  *Id.* at #6649-6650.

Counsel for Flores further engaged Prospective Juror 40, asking "What if I told you that that's not really what I'm trying to convince you of?"  *Id.* at #6650.  In response, Prospective Juror again stated, "I mean, literally, I could not sleep last night worrying about this situation because I feel like I do have a bias against them, and I don't know that anybody could convince me otherwise. . . . "  *Id.* at #6650-6651.  The district court interrupted and suggested to defense counsel, "I'm thinking that probably—are you ready to move to the next question?"  *Id.* at #6651.  Defense counsel then requested a sidebar.  *Id.*

At the sidebar, Flores's other counsel initially asserted that Prospective Juror 40 had "poisoned the entire venire talking about MS-13."  *Id.* at #6651.  Counsel for Tidwell agreed.  *Id.* at #6655.  But during the ensuing colloquy, the counsel for Flores who had been conducting voir dire confirmed his intent to "ask the jurors, okay,

suppose you heard negative things about MS-13; what impact would that have . . . ?" *Id.* at #6653-6655 ("where you just went is where I was trying to go"). After further discussion, the district court decided to give a "strong curative instruction" and clarified, "if anyone is moving, I'm going to deny and give a curative instruction because I do think it's curable." *Id.* at #6657, 6661. At defense counsel's request, the district court agreed to delay its instruction until after defense counsel asked if others shared Prospective Juror 40's views. *Id.* at #6662. With this plan, counsel for Flores said, "You know what? I'm good with this." *Id.* at #6662.

After voir dire resumed, two other venirepersons stated that they felt the same way as Prospective Juror 40. *Id.* at #6664. Prospective Juror 12 volunteered, "I echo . . . [and] agree with . . . a lot [Prospective Juror 40] said about the gangs"; "[I am] very intimidated by this whole thing . . . looking at the gory pictures"; and "I still might stereotype or assume somebody is guilty." *Id.* at #6665. Prospective Juror 7 commented that "a gang is not government-supported activities" and "not the way of American life." *Id.* at #6670. After hearing those opinions, defense counsel again asked if anyone else "shares the opinions of [Prospective Jurors 40, 12, or 7]" and received no additional responses. *Id.* at #6672.

The district court then instructed the venirepersons that "the jury decides the case based on the law as the Court instructs it and the facts introduced in this court." *Id.* The court repeatedly noted that prior life experiences and opinions "are not evidence of anything"; that "[t]here's no evidence of anything" at this point and

"certainly no evidence for these defendants who start with a clean slate that whatever MS-13 is, that they were involved with MS-13"; and that there is "[n]o evidence that they committed any crimes." *Id.* at #6672-6673. The court emphasized, "the key is that folks need to make their decision based on the law and the evidence and not be swayed by things that are not the law and the evidence." *Id.* at #6673. When the court asked if anyone would be unable to "set aside any preconceptions and decide the case based on the facts the law," only Prospective Juror 40 responded. *Id.* at #6674. With the agreement of the parties, the court struck Prospective Jurors 40, 12, and 7 for cause. *Id.* at #6691-6692.

In preliminary instructions after the jury was sworn, the court emphasized that the jury must "decide the case solely on the evidence presented here in the courtroom" and should "disregard" "[a]nything you may have seen or heard outside the courtroom." Trial Tr., R.604, #3927. In the final jury charge, the court again instructed the jury to "make your decision based only on the evidence that you saw and heard here in court"; not to let "anything else that you may have seen or heard outside of court influence your decision in any way"; and to "[m]ake your decisions based only on the evidence . . . and nothing else." R.614, #6036-6037.

B.    Standard of Review

This Court reviews for abuse of discretion a district court's handling of voir dire, including the denial of a mistrial motion claiming that a defendant was denied his right to an impartial jury under the Sixth Amendment. *See United States v. Silvers*, 129 F.4th

332, 350 (6th Cir. 2025) (noting that "federal judges have been accorded ample discretion in determining how best to conduct the voir dire" (quotations omitted)); *United States v. Knipp*, 963 F.2d 839, 845 (6th Cir. 1992).

But where a defendant raises no specific objections to voir dire procedures or does not move for a mistrial after an alleged due-process violation, this Court has applied plain-error review. *See United States v. Farris*, 733 F. App'x 237, 240 (6th Cir. 2018) (reviewing for plain error where defendant raised no "specific challenges" to voir dire); *United States v. Kechego*, 91 F.4th 845, 850 (6th Cir. 2024) (applying plain-error review to claim that district court erred by not conducting hearing to determine whether jury tainted by external influences); *see* Fed. R. Crim. P. 52(b). Plain-error "requires an error that is clear or obvious, affects the appellant's substantial rights, and seriously affects the fairness, integrity or public reputation of judicial proceedings." *Kechego*, 91 F.4th at 850 (quotations omitted).

This Court should review Tidwell's claim for plain error. To the extent Tidwell now alleges (Br.38) that the district court erred by not "conduct[ing] a more thorough inquiry," no defendant requested additional voir dire beyond the follow-up questions asked by defense counsel and the court. And after the court asked questions and gave a curative instruction, no defendant objected that more was required. To the extent Tidwell now suggests (Br.37) that his Sixth Amendment right to an impartial jury was violated, no defendant moved for a mistrial on those grounds, including when the district court selected jurors from the first venire group or when the jury was impaneled.

C.    <u>Argument</u>

The Sixth Amendment guarantees "the accused" the right to trial "by an impartial jury." U.S. Const. amend. VI. An impartial jury is one that "will conscientiously apply the law and find the facts." *See Lockhart v. McCree*, 476 U.S. 162, 178 (1986) (quotations omitted). But it is fundamental that "[t]he right to an 'impartial' jury 'does not require *ignorance*.'" *United States v. Tsarnaev*, 595 U.S. 302, 312 (2022) (quoting *Skilling v. United States*, 561 U.S. 358, 381 (2010)). Although Tidwell highlights comments by Prospective Jurors 40, 12 and 7, each of those prospective jurors was dismissed. To demonstrate a Sixth Amendment violation, Tidwell must show that a juror actually impaneled in his case was biased. *See Ross v. Oklahoma*, 487 U.S. 81, 86 (1988) ("Any claim that the jury was not impartial, therefore, must focus not on [the challenged juror], but on the jurors who ultimately sat."). Because Tidwell cannot show that the prospective jurors' comments biased the entire venire, particularly after the additional voir dire and curative instruction, his claim fails.

First, there is no presumption that these comments automatically biased the venirepersons who heard them. *See United States v. Guzman*, 450 F.3d 627, 629, 631 (6th Cir. 2006) (explaining that there is no de facto "problem when potential jurors announce their potential biases" to a venire group and collecting cases). Prospective Juror 40 stated the belief that MS-13 was not a "benevolent" organization and expressed having trouble sleeping after hearing about crime-scene and autopsy photos the day before and perceiving that defense counsel would equate MS-13 with the Girl Scouts

or church.  R.639, #6649.  Tidwell (Br.36) suggests that these remarks reflected an "environment of fear."  But in context, as the district court explained at sidebar, "the comment about sleeping . . . that's a natural result of . . . we read an indictment and allegations of lots of murders" and "a discussion about nasty autopsy photos and so forth."  R.639, #6656.  These facts are therefore unlike *United States v. Blitch*, 622 F.3d 658 (7th Cir. 2010), cited by Tidwell (Br.47), in which "all" prospective jurors were discussing safety fears after learning that defendants had access to their personal information and the trial judge denied defense counsel's request for individual voir dire for scheduling reasons.  *Id.* at 668.

Second, subsequent voir dire confirmed that the relatively mild remarks of Prospective Juror 40 did not bias the entire venire group.  At defense counsel's request, the district court delayed its curative instruction to allow defense counsel to probe whether other venirepersons "felt the same way."  Prospective Jurors 12 and 7 responded affirmatively (and were later dismissed), demonstrating that defense counsel's follow-up questions were effective in identifying anyone who shared this potential bias.  R.639, #6664, 6670.  All other venirepersons indicated that they did *not* share these views, *id.* at #6672, confirming that no juror who later sat on Tidwell's jury had been affected.

Third, to the extent any ambiguity remained, the district court's additional questions made clear that the remarks did not impact the impartiality of the ultimately seated jurors.  The court confirmed that, other than Prospective Juror 40, all

venirepersons were able to follow the court's instructions to decide the case based on the law as instructed and the facts proved at trial. *Id.* at #6674. The district court, whose assessment is entitled to deference, was satisfied that those responses were credible. *See Tsarnaev*, 595 U.S. at 312-313 (noting that jury selection falls "particularly within the province of the trial judge" whose "appraisal is ordinarily influenced by a host of factors impossible to capture fully in the record" (quotations omitted)); *see also United States v. Braxton*, No. 20-1491 et al., 2022 WL 910571, at *4 (6th Cir. Mar. 29, 2022) ("The question whether a jury is fair and impartial is essentially one of credibility, and the district court's resolution of that question is entitled to special deference." (quotations omitted)).

Finally, additional assurance of the jury's impartiality was provided by the district court's instructions to the venire, preliminary instructions to the impaneled jury, and final jury charge. The court repeatedly told the jury that its decision must be based on the evidence in the case and nothing else. R.604, #3927; R.614, #6036-6037; R.639, #6673. These instructions, which jurors are presumed to have followed, would have resolved any possible taint from the prospective jurors' comments. *See Reynolds v. Bagley*, 498 F.3d 549, 556 (6th Cir. 2007) (reasoning that although prospective juror's comments that prosecution witness was honest "could *theoretically* have biased ultimately-seated jurors," the defendant "failed to show that there was any *actual* bias, especially given the trial judge's subsequent curative instruction that jurors would have to decide the case for themselves"); *Knipp*, 963 F.2d at 845 (finding that "it would

require some hysteria to conclude that the comment [by a prospective juror about believing a government witness] had any real impact on the impartiality of the remaining jurors who, it must be assumed, followed the district court's instructions to judge witness credibility for themselves"); *see also United States v. Baker*, No. 24-1242, 2025 WL 342862, at *2 (9th Cir. Jan. 30, 2025) (no plain error where district court similarly instructed the jury).  In these circumstances, the district court did not commit any error, let alone reversible plain error, in proceeding with jury selection.

## III.  The district court evidentiary rulings were correct and do not warrant reversal.

Tidwell and Pineda-Caceres collectively raise three evidentiary challenges. Tidwell challenges (Br.38-46) the admission of (1) expert testimony from Detective Betts about the inner workings of MS-13; and (2) certain co-conspirator statements elicited from cooperating witness Avila.  Pineda-Caceres challenges (Br.14-18) the exclusion of testimony by jail employees that Baca, a cooperating witness, threatened them.  None of these arguments has merit.

### A.  Background

1.  Prior to trial, the government notified Defendants that Detective Betts would testify as an expert on the organization, leadership, structure, language, rules, practices, history and operation of MS-13.  Notice, R.401, #1351.  No defendant objected to Betts's qualifications as an expert or his prospective testimony.  At trial, Detective Betts described the gang's structure, including the hierarchy of member ranks

within each clique, the rules of the gang, and the gang's symbols and tattoos. R.605, #4034. Detective Betts also testified that he did not know Defendants, was not familiar with "the facts of this case at all," and did not work on this case. *Id.* at #4012. On cross-examination, counsel for Tidwell asked if MS-13 was "a single unified organization . . . like[] Walmart?"; Detective Betts responded without objection that it was "not equivalent to Walmart" but was "one criminal enterprise." *Id.* at #4046. Counsel for Tidwell asked if that answer was "your legal judgment," and Detective Betts responded that it was what "I believe." *Id.*

2. The district court addressed the admission of co-conspirator statements in a written pretrial order that set forth the procedures for challenging such statements. The court (1) allowed Defendants to object to any co-conspirator statements; (2) indicated that it would conditionally admit the statement if the government properly invoked the co-conspirator exception to the hearsay rule under Rule 801(d)(2)(E); (3) required the parties to make a record of the objection and the statement; and (4) required the objecting Defendant to renew his objection "at the close of the evidence" or else the objection would be "deemed waived." Order, R.465, #2132-2133.

During trial, a former gang member and cooperating government witness, Avila, testified that gang member Franklin "earn[ed]" "the jump" to a higher rank after he was involved in the murder of Garcia-Munoz in the parking lot of Bola Ocho. R.600, #2986. Avila explained that, as a homeboy in TPLS, it was "important" for him to know the details of a rival gang member's murder. *Id.* at #2980. Avila then relayed

Franklin's statements that "he, [Flores], [Tidwell], and [another co-conspirator] were following the chavala" into the Bola Ocho parking lot; that Flores and Tidwell shot the victim; and that the motive for the shooting was that the victim was a chavala. *Id.* at #2987-2989. The court conditionally admitted the statements over defense counsel's initial objection, reminding counsel that the objection should be "logged for later discussion." *Id.* at #2984-2987.

The government also elicited co-conspirator statements from Avila about Laines's murder. Avila, who was in jail at the time of this murder, R.606, #4380, explained that it remained "important" to be "up to date" on gang activities, including if someone helped a rival gang member in violation of MS-13 rules, R.600, #3018. Avila then relayed Hernandez's statements describing Laines's murder, including that Flores and Hernandez shot Laines in the trunk of a car that they later set on fire and that their motive was Laines's interactions with a rival gang member. *Id.* at #3020-3021. The court conditionally admitted the statements over defense counsel's initial objection. *Id.* at #3019.

At the close of evidence, Defendants did not renew their objections to the admission of co-conspirator statements, as the district court's pretrial order required them to do. Nevertheless, Tidwell later challenged the admission of co-conspirator statements in his motion for a new trial under Rule 33. The district court denied that challenge, finding that Defendants waived their objections by failing to renew them at the close of evidence. R.730, #7557-7558. The court also determined that, even if the

objection had been preserved, the statements were "easily justifiable" as "keeping coconspirators informed." *Id.* at #7559-7561.

3.     During trial, a former gang member and cooperating government witness, Baca, testified that after his fellow gang member Lopez was killed, he felt disconnected from the gang and stopped attending meetings. R.607, #4516-4517. He also testified that the gang ordered a green light (hit) on him. *Id.* at #4613. A different former gang member and cooperating witness, Avila, also testified that Ochoa had ordered a hit on Baca. R.600, #3001-3002.

Pineda-Caceres moved to allow testimony from two jail employees that Baca had threatened to put a "hit" on them. Motion, R.558, at 1. Pineda-Caceres argued that these threats "contradict[ed] Government witness Hector Baca's testimony that he is no longer associated with MS-13." *Id.* The district court denied the motion, finding that Baca's comments to the jail employees were "substantially too general to be inconsistent with the notion of leaving MS-13." R.612, #5609. As the court explained, Baca's references to a hit could mean a hit by "anybody." *Id.* at #5609-5610.

The court then permitted Pineda-Caceres to make an offer of proof. A corrections officer testified that Baca became angry about being ordered to change cells and threatened to "beat [his] ass," made a gun symbol and fist with his hands, and said that he (Baca) would get a hit man. *Id.* at #5677-5680. A jail nurse testified that Baca became angry and threatened to "snap [her] neck" after being denied medication. *Id.* at #5684. After this proffer, the court reiterated its ruling, finding that Baca's threats

were general and did not reference MS-13. *Id.* at #5685. Accordingly, the court found that the proposed testimony did not "impeach the notion that [Baca] . . . was no longer a part of MS-13." *Id.*

Following trial, Pineda-Caceres renewed this argument in a motion for a judgment of acquittal or new trial, but after taking "another look," the district court again found no trial error. R.730, #7527-7529. As the court explained, "the proffered testimony would not serve to impeach [Baca]" because his threats and hand signs had no apparent connection to MS-13. *Id.* at #7528. The court also noted that excluding "extrinsic evidence to impeach" was within its discretion. *Id.* at #7529. In any event, the court determined that the evidence was properly excluded under Rule 403 because of "the risk of confusion and frankly waste of time." *Id.*

B.    Standards of Review

A preserved evidentiary objection is reviewed for abuse of discretion. *See United States v. Schreane*, 331 F.3d 548, 564 (6th Cir. 2003). In the absence of a contemporaneous objection, review is for plain error. *See United States v. Knowles*, 623 F.3d 381, 385 (6th Cir. 2010) (collecting cases). The plain-error standard "applies to instances where the objection raised on appeal, regarding evidentiary admissibility, is not based upon the same grounds to which they were objected at trial." *United States v. Campbell*, 86 F. App'x 149, 156 (6th Cir. 2004). A plain error is one so "plain the trial judge and prosecutor were derelict in countenancing it." *United States v. Gold Unlimited, Inc.,* 177 F.3d 472, 483 (6th Cir. 1999) (quotations omitted). Plain error requires (1) an

error, (2) that is clear or obvious, (3) that affects the defendant's substantial rights, and (4) that affects the fairness, integrity, or public reputation of the judicial proceedings. *See United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc). "[T]he burden of establishing entitlement to relief for plain error is on the defendant claiming it," *United States v. Dominguez Benitez*, 542 U.S. 74, 82 (2004), and in order to show an impact on "substantial rights," a defendant generally must show that it "affected the outcome of the district court proceedings," *United States v. Marcus*, 560 U.S. 258, 262 (2010) (quotations omitted).

Tidwell's evidentiary challenges are unpreserved and should be reviewed for plain error. Tidwell acknowledges (Br.39) that he did not object to Detective Betts's testimony. Tidwell also did not preserve his objections to the co-conspirator statements. The district court's pre-trial order required defense counsel to renew any objections at the close of evidence, R.465, #2132-2133, and the court reminded counsel of that obligation during trial, R.600, #2984-2987. But Tidwell failed to renew his objections, and the court therefore lacked notice that he was continuing to challenge the conditionally admitted statement as of the close of evidence, once the full context of the statements was clear and the record concerning their admissibility complete. *See, e.g., United States v. Robinson*, 390 F.3d 853, 867 (6th Cir. 2004) ("[W]e have long recognized the trial court's prerogative to conditionally admit co-conspirator statements subject to later demonstration of their admissibility by a preponderance of the evidence." (quotations omitted)).

Pineda-Caceres preserved his objection to the exclusion of testimony by the jail employees.  R.612, #5686.  Accordingly, the Court should review the district court's decision to exclude that testimony for abuse of discretion.[6]

C.    Tidwell's Claims

1.    The admission of Detective Betts's expert testimony was proper and not plainly erroneous.

The district court did not plainly err in admitting Detective Betts's expert testimony.  It is well established under Federal Rule of Evidence 702 that expert testimony imparting "evidence regarding the inner-workings of organized crime" is "a proper subject of expert opinion because such matters are generally beyond the understanding of the average layman." *United States v. Rios*, 830 F.3d 403, 413 (6th Cir. 2016) (quotations omitted).  Tidwell does not dispute that Betts was properly qualified as an expert or that his testimony was relevant.  Tidwell instead asserts (Br.39-43) that Betts opined on the fact questions in this case in violation of Federal Rule of Evidence 704(b).  That argument lacks merit.

---

[6] This Court reviews alleged violations of the Confrontation Clause de novo.  *See United States v. Adams*, 722 F.3d 788, 829 (6th Cir. 2013).  Pineda-Caceres refers (Br.17) to his Sixth Amendment "right to impeach" Bacas but he has not developed a confrontation clause argument either in his brief on appeal or before the district court. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." (quotations omitted)).

Rule 704(a) instructs that an opinion is "not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a). Rule 704(b) then carves out one type of opinion that embraces an ultimate issue: "[A]n opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense." Fed. R. Evid. 704(b). To review whether an expert violated that rule, the court "ask[s] whether the expert actually referred to the intent of [the defendant]." *United States v. Xu*, 114 F.4th 829, 841 (6th Cir. 2024) (quotations omitted); *see also Diaz v. United States*, 602 U.S. 526, 538 (2024) (holding that "expert's conclusion [about] 'most people' in a group" was not "an opinion about 'the defendant'").

Betts did not opine on Tidwell's mental state. In fact, he expressed no opinions specific to Defendants or TPLS. He provided general opinion testimony about the rules and practices of MS-13, such as how the gang uses the phrase "earn[]your letters" to mean permission to receive an MS-13 tattoo in recognition of a "violent act[] on behalf of MS-13," and how the gang issues a "green light" to mean that an individual should be killed. R.605, #4035-4036, 4040, 4106. When Detective Betts referred to MS-13 as "one criminal enterprise," he did so without objection in response to a cross-examination question asking whether MS-13 is "a single unified organization." *Id.* at #4046. This opinion testimony was well within the permissible scope of Betts's role as an expert witness assisting the jury with a general understanding of MS-13. *See United States v. Ledbetter*, 929 F.3d 338, 349 (6th Cir. 2019) (no plain error in testimony that

"equipped the jury with an understanding of general Crips culture to help it determine whether the Short North Posse was a criminal enterprise").

> ### 2. The admission of co-conspirator statements was proper and not plainly erroneous.

The district court did not err, much less plainly err, in admitting certain co-conspirator statements. A statement offered against an opposing party is not hearsay if it "was made by the party's coconspirator during and in furtherance of the conspiracy." Fed. R. Evid. 801(d)(2)(E). A statement is "'in furtherance of' a conspiracy if it is intended to promote the 'objectives of the conspiracy.'" *United States v. Warman*, 578 F.3d 320, 338 (6th Cir. 2009). "Whether a statement was in furtherance of a conspiracy turns on the context in which it was made and the intent of the declarant in making it." *Id.* "[A] statement may be admissible as in furtherance of a conspiracy even if not exclusively, or even primarily, made to further the conspiracy." *United States v. Tocco*, 200 F.3d 401, 419 (6th Cir. 2000) (quotations omitted).

The admitted co-conspirator statements about the murders of Garcia-Munoz and Laines were made in furtherance of the conspiracy. Tidwell's characterization (Br.45) of the statements as "idle chatter" ignores context and intent. Avila, the testifying witness, explained that, as a homeboy in the gang, it was "important" to know the circumstances of Garcia-Munoz's murder. R.600, #2980, 2987-2989. With respect to the statements about Laines's murder, Avila testified that he needed to stay "up to date" on gang activities, including identifying anyone who had violated gang rules. *Id.*

50

at #3018, 3020. These statements were intended to update Avila about ongoing gang activity that furthered the purpose of the conspiracy. *See, e.g., Warman,* 578 F.3d at 338 (approving of statements in furtherance of a conspiracy that "identify other co-conspirators or their roles[ and that] apprise other co-conspirators of the status of the conspiracy" (brackets and quotations omitted)). This case is therefore unlike *United States v. Darwich*, 337 F.3d 645 (6th Cir. 2003), where the Court found that casual conversation about past events was unconnected to the purpose of the conspiracy charged in that case. *Id.* at 658.

> 3.  <u>Any error did not affect Tidwell's substantial rights and does not warrant reversal under the fourth plain-error prong.</u>

Even assuming that the district court committed a clear or obvious error in allowing Detective Betts's testimony or admitting co-conspirator statements, Tidwell cannot carry his burden of showing that the error affected his substantial rights.

The importance of Detective Betts's testimony to Tidwell's guilt was relatively minor in light of the numerous other witnesses who confirmed MS-13 practices and the overwhelming evidence of his guilt. Accordingly, Tidwell cannot demonstrate a reasonable probability that his testimony affected the outcome of his trial. *See Marcus*, 560 U.S. at 262; *see also, e.g., Rios*, 830 F.3d at 416 (finding any error harmless where testimony of contested expert was "separately confirmed by witnesses who testified to the same or very similar facts"); *see also United States v. Lucas*, No. 19-6390 et al., 2021

WL 4099241, at *18 (6th Cir. Sept. 9, 2021) (finding any error harmless in light of other evidence of guilt).

Nor did the admission of the co-conspirator statements affect Tidwell's substantial rights. Strong circumstantial evidence independently connected Tidwell to the Garcia-Munoz murder, including Cindy's testimony about overhearing him looking for a gun, the surveillance video, cellphone tower data, and Tidwell's own comments and actions. *See* pp. 12-13, *supra*. With respect to the statements about Laines's murder, Tidwell was not charged in a substantive VICAR count pertaining to that murder, and his conviction for RICO conspiracy is sustained by numerous other racketeering acts. *See* pp. 5-15, 18-20, *supra*. In any event, other evidence established the facts of Laines's murder, including testimony by Hernandez, one of the shooters, and Delgado-Flores, who was part of the group that brought Laines to the shooters and picked up the shooters after the murder. R.603, #3703-3706; R.611, #5408-5418. Significant circumstantial and physical evidence corroborated their testimony. *See* pp. 16-17, *supra*.

Finally, under the fourth plain-error prong, Tidwell has not shown that any error affected the fairness, integrity, or public reputation of the judicial proceedings as required for vacatur. *See Vonner*, 516 F.3d at 386.

D.  Pineda-Caceres's Claim

    1.  The district court properly exercised its discretion in excluding extrinsic evidence of Baca's jail conduct.

Under Federal Rule of Evidence 608(b), other than a criminal conviction, "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness."  Nevertheless, this Court has contemplated the admission of extrinsic evidence for "impeachment by contradiction," though it views that doctrine with "skepticism" and has not expressly recognized it. *United States v. Craig*, 953 F.3d 898, 905 (6th Cir. 2020); *see also United States v. Scott*, 693 F.3d 715, 721 (6th Cir. 2012) ("We have not recognized the doctrine of impeachment by contradiction[.]").  Regardless of whether admissibility is analyzed under Rule 608 or the impeachment-by-contradiction doctrine, the evidence in question must actually impeach the witness.  *See* Fed. R. Evid. 608(b) (governing evidence probative of witness's character for truthfulness); *Craig*, 953 F.3d at 904 (describing doctrine of impeachment by "specific contradiction").

The district court acted well within its discretion in finding that the proffered evidence concerning Baca's conduct in jail had no impeachment value.  As the district court explained, Baca's generic verbal threats and hand gestures to jail staff had no apparent connection to MS-13.  R.730, #7528-7529.  For instance, there was no evidence that Baca's hand gestures were gang signs. *Id.* at #7528.  Similarly, as the court noted, Baca's reference to hiring a hit man actually suggested that he did not have

53

existing gang connections available to carry out a hit. *Id.* at #5728-5729. Moreover, as the court further found, whether Baca remained an MS-13 member after cooperating with the government was a collateral matter. *Id.* at #7529. Although Pineda-Caceres characterizes (Br.17) the question of whether Baca remained a gang member as relevant to "whose 'side' [Baca] was really on," *i.e.,* Baca's overall credibility, the issue has no direct bearing on a material fact.

Pineda-Caceres is mistaken (Br.15-17) in analogizing these facts to *United States v. Adams*, 722 F.3d 788 (6th Cir. 2013). In *Adams,* this Court found that the trial judge erred by not permitting a defendant to attack the credibility of a hearsay declarant with testimony that the declarant had "memory problems." *Adams,* 722 F.3d at 834. But unlike the declarant in *Adams*, Defendants had ample opportunity to attack Baca's credibility because he testified at trial and was subject to cross-examination. And in any event, unlike the proffered evidence in *Adams* that the declaration had "serious issues with this short-term memory," *id.*, here, the evidence of Baca's jail conduct had no bearing on the credibility of his trial testimony. The district court did not abuse its discretion by excluding the proffered testimony.

### 2.    Any error was harmless.

Even if the district court erred in excluding extrinsic evidence of Baca's threats to jail employees, the error was harmless. *See generally United States v. Young*, 847 F.3d 328, 349-350 (6th Cir. 2017) ("Non-constitutional errors are subject to the Rule 52(a) harmless error analysis, in which the government must show by a preponderance of the

evidence that the error did not materially affect the verdict."). Assuming *arguendo* that the proffered testimony was relevant to Baca's status in the gang, its weight was minimal given clear evidence that Baca was no longer a member. Specifically, as of February 2017, the gang had a green light on Baca for suspected cooperation with police and gang members tried to murder Baca on February 18, 2017. *See* R.600, #3001-3002; *see also* pp. 10-11, *supra*. In any event, whether Baca remained a gang member had minimal, if any, relevance to his overall credibility given that defense counsel elicited other, more relevant credibility evidence during cross-examination about prior inconsistent statements, lack of first-hand knowledge, and the benefits Baca expected to receive by cooperating with the government. *See, e.g.,* R.607, #4575-4582, 4589-4595.

In any event, there was overwhelming evidence of Pineda-Caceres's guilt even setting aside Baca's testimony. Multiple witnesses described Pineda-Caceres's involvement in the RICO conspiracy, the murder of Alvarado in the field, and the murder of Liliana and attempted murder of Rodriguez. *See* pp. 5-9, *supra*. Under these circumstances, any error in excluding testimony from the jail employees was harmless.

## IV. The district court correctly denied the motion for a mistrial after a co-defendant pleaded guilty.

Tidwell argues (Br.46-49) that the district court erred in denying his motion for a mistrial after a co-defendant, Luis Colindres, pleaded guilty during trial. That argument lacks merit.

A.    Background

After day seven of the 18-day trial, a co-defendant, Luis Colindres, pleaded guilty to certain charges in the second superseding indictment.  Plea Agreement, R.546, #2721-2737.  On the next trial day, counsel for Tidwell moved for a mistrial, arguing (1) that the "only rational inference" the jury could draw from Colindres's absence was that he pleaded guilty; and (2) that evidence of a double homicide, in which Colindres had been implicated, was prejudicial to Defendants.  R.607, #4446-4448.

The district court denied the motion.  *Id.* at #4450.  The court explained that it would instruct the jury not to speculate as to the reason for Colindres's absence.  *Id.* at #4451.  The court further reasoned that even if the jury were to speculate, the jury might think that "maybe the guy had a medical incident"; that "the government dismissed all the charges"; or that "the guy who is responsible for all this bad stuff . . . well, he pled guilty," making the remaining defendants "look good by comparison."  *Id.*  Moreover, the court explained that the double homicide remained relevant as an overt act in the RICO conspiracy and motive for the murder of Arling Laines.  The court pointed out, however, that Defendants were free to argue that their clients were not charged in the double homicide.  *Id.* at #4456-4458.

When the jury returned to the courtroom, the district court observed that "Mr. Colindres is no longer in the courtroom with his counsel" and then instructed the jury to "[g]ive it no thought" and "not to speculate as to why that's the case"; that Colindres's absence was "not evidence of anything."  *Id.* at #4467.  The court further

instructed that Colindres's absence "bears in no way, shape, or form on whether the government can or will meet its burden of proof that it bears as to each of the three defendants that remain." *Id.* The court reminded the jury that its task would be to decide "with respect to each count against a defendant, whether the government has met its burden of proof with respect to that count," and that "Mr. Colindres being or not being in this courtroom has nothing to do with any of those issues." *Id.* at #4468.

In its final charge, the district court reiterated that the jury must "separately consider the evidence against each defendant and to return a separate verdict for each one of them," and that "[its] decision on one defendant, whether it is guilty or not guilty, should not influence [its] decision on any of the other defendants." R.614, #6043-6044. The court also instructed the jury that it should "not let the possible guilt of others influence your decision in any way, except that you may consider the fact that a witness has admitted guilt to particular crimes when assessing the witness's credibility." *Id.* at #6042-6043.

Following trial, Tidwell renewed his contention that a mistrial was warranted because of Colindres's absence in his motion for a new trial under Rule 33. R.632, #6305-6308. The district court again rejected this claim, finding no error. R.730, #7552. The court observed that Tidwell's theory that the jury had speculated that Colindres had pleaded guilty was itself "really very speculative" in light of the instruction not to speculate and other possible explanations for Colindres's absence. *Id.* at #7551-7552. The court also reasoned that even speculation that Colindres had

57

pleaded guilty was not necessarily prejudicial because the jury might have concluded that Tidwell "sticking to his guns" was reason to believe "[m]aybe there's something to this defense." *Id.* at #7552.

B.    Standard of review

This Court reviews a district court's decision on a motion for mistrial for abuse of discretion. *See United States v. Wandahsega*, 924 F.3d 868, 878 (6th Cir. 2019).

C.    Argument

The district court properly responded to Colindres's absence from the courtroom by instructing the jury to "give it no thought." This Court and other circuits have approved of similar missing-defendant instructions to address the sudden absence of a co-defendant during trial. *See United States v. Walker*, 1 F.3d 423, 428 (6th Cir. 1993) (finding no error in the district court's instruction "not to draw any inference" from the fact that two of four defendants were no longer in the courtroom); *see, e.g., United States v. Garrison*, 888 F.3d 1057, 1066 (9th Cir. 2018) ("In instances where defendants depart from a multi-defendant trial late in the trial . . . the best course may be simply to tell the jury that the defendant is no longer part of the case." (quotations omitted)); *United States v. Barrientos*, 758 F.2d 1152, 1156 (7th Cir. 1985) ("This court has implied . . . that a cautionary instruction which merely informs the jury of the defendant's absence is the preferred method in this circuit for abating a jury's curiosity regarding the fate of a co-defendant.").

Tidwell asserts (Br.46-47) that the instruction was "inadequate" because a guilty plea was the "only rational explanation" for Colindres's absence. But the district court instructed the jury not to speculate, R.607, #4467, and jurors are presumed to follow a court's instructions, *see United States v. Olano*, 507 U.S. 725, 740 (1993). And as the district court pointed out, the jury may have considered other explanations for Colindres's absence, like a medical issue. R.607, #4451.

Tidwell is also incorrect (Br.47) in claiming "serious prejudice." Even if the jury correctly guessed that Colindres had pleaded guilty, the court's instructions would have alleviated any basis for a mistrial. The district court repeatedly told the jury to consider the guilt of each defendant individually. R.607, #4467-4468; R.614, #6043-6044. The court also separately instructed the jury that the guilty pleas of others should have no bearing on the verdict, except insofar as it might affect a witness's credibility. R.614, #6042-6043. This Court has found no such prejudice even when a co-defendant pleads guilty mid-trial, the jury learns of that guilty plea, and the co-defendant returns to testify against the remaining defendant. *See United States v. Bavers*, 787 F.2d 1022, 1028-1029 (6th Cir. 1985) (no basis for mistrial where co-defendants pleaded guilty during trial and testified against remaining defendant). Tidwell attempts (Br.48) to distinguish *Bavers* on the ground that, unlike the defendant in *Bavers*, he did not cross-examine Colindres. But Tidwell fails to acknowledge that his jury did not know of Colindres's guilty plea, suggesting less potential prejudice than that in *Bavers*, and that he could have called Colindres as a defense witness.

Tidwell is also mistaken in relying (Br.33, 47) on the evidence regarding Colindres's involvement in a double homicide to demonstrate prejudice. That evidence would have been admitted at his trial whether or not Colindres pleaded guilty. The double homicide was an overt act in the RICO conspiracy in which Tidwell was charged. Second Superseding Indictment, R.150, #425. The double homicide also explained the motive for Laines's murder later that night, another act in the RICO conspiracy, and a murder for which Defendant Flores was charged. Indeed, no Defendant objected or requested a limiting instruction when evidence of the double homicide was admitted even after Colindres pleaded guilty. *E.g.*, R.611, #5398 (cooperating witness Hernandez describing double homicide). And as the district court noted, Defendants were free to argue that they were not involved with, and not charged in, the double homicide.

Finally, any prejudice would have been minimal in light of the overwhelming evidence of Tidwell's guilt. *See* pp. 12-15, *supra*. *Cf. United States v. Stapleton*, 297 F. App'x 413, 422 (6th Cir. 2008) (collecting cases upholding denial of mistrial where improper witness comments formed small part of evidence against defendant).

## V. The district court correctly denied Flores's motion to suppress evidence recovered from the Priest Woods residence pursuant to a search warrant.

Flores claims (Br.9, 12-13) that the district court erred in not suppressing evidence recovered pursuant to a search warrant for a Priest Woods residence because

the warrant was based, in part, on evidence observed during a protective sweep that exceeded its proper scope. That is incorrect.

A.    Background

On October 4, 2017, police arrested Flores outside of a residence on Priest Woods Drive, where Flores lived with his girlfriend and infant daughter in a downstairs bedroom. R.606, #4317-4320. Officers conducted a protective sweep of the residence. In an upstairs bedroom, they encountered two other individuals, Franklin Hernandez and Franklin Pineda-Caceres, and arrested them pursuant to outstanding warrants. 3:19-cr-42, Hearing Tr., R.59, #172-174. Officers also observed a Glock drum magazine and AR-15 in the downstairs bedroom and bathroom. *Id.* at #173, 233. Officers later obtained a warrant to search the residence based in part on what they had observed during the protective sweep. *Id.* at #241-242. The execution of that search warrant led to the seizure of several incriminating items, including firearms and cocaine. *See* pp. 19-20, *supra.*

Following his indictment in a case docketed at No. 3:19-cr-42 (M.D. Tenn.), Flores moved to suppress evidence recovered pursuant to the warrant-authorized search of the Priest Woods residence on October 4, 2017. Motion, 3:19-cr-42, R.41,

#73.  The district court held a suppression hearing and denied the motion.  3:19-cr-42,

R.59, #228-230, 241-242; Order, R.51, #115-121.[7]

First, the district court found that the initial warrantless entry into the Priest

Woods residence was justified as a protective sweep.  3:19-cr-42, R.59, #227.  The court

explained that, after police arrested Flores outside the residence, "a reasonably prudent

officer" would have believed that the residence "harbor[ed] an individual posing a

danger to those on the arrest scene."  *Id.*  The court pointed to several articulable facts

supporting that belief—a warrant for Flores's arrest for murder; source information

that Flores might be with MS-13 members, and that they might be driving a white

Chrysler; the fact that a white Chrysler was outside the house, corroborating the source

and suggesting that dangerous individuals might be inside the residence; the fact that

when police arrested Flores, an occupant first denied that Flores was present before

changing her story; and the fact that the door to the residence was closed after Flores

---

[7] The district court dismissed without prejudice the indictment in No. 3:19-cr-42 after the government filed a superseding indictment in this case (No. 3:18-cr-293) that added the charges filed in No. 3:19-cr-42.  Order, 3:19-cr-42, R.57, #133.  The two cases were before the same district court.  Flores does not appear to have renewed his motion to suppress in this case (No. 3:18-cr-293) after the superseding indictment was returned.  The government assumes for purposes of this appeal that Flores preserved his suppression claim by raising it in No. 3:19-cr-42 before the superseding indictment in this case was returned.  If the Court concludes otherwise, it may still review Flores's claim for plain error under Federal Rule of Criminal Procedure 52(b), but it is not required to do so.  *See United States v. Ramamoorthy*, 949 F.3d 955, 962-964 (6th Cir. 2020) (failure to file Rule 12(b)(3) suppression motion does not preclude review for plain error on appeal, but review of claim is permissive, not mandatory).

exited. *Id.* at #228-231. The court further found that after they arrested Flores, officers who had been stationed behind the residence could not withdraw from the scene without passing within firing range of the residence windows. *Id.* at #225.

Second, the court "look[ed] closely" at the scope of the protective sweep. *Id.* at #233. The court determined that the Glock drum magazine and AR-15 were found "within the scope of a proper protective search." *Id.* Specifically, the court found that police located the Glock drug magazine when looking under a bed, which the court determined to be "fair game" as a place where an individual could hide. *Id.* Likewise, after considering the unchallenged testimony of an officer at the scene, the court found that police located the AR-15 in plain view. *Id.* at #234-235.

Accordingly, the district court declined to suppress evidence recovered from a search of the residence later that day pursuant to a search warrant. *Id.* at #241. The court rejected Flores's claim that this evidence was "fruit of the poisonous tree," explaining that the search-warrant affidavit "set forth probable cause" and "properly include[d] what was observed during the protective sweep." *Id.* at #241-242. Alternatively, the court determined that suppression would not be warranted under the good-faith exception to the exclusionary rule. *Id.* at #242.

B.     Standard of Review

When reviewing the denial of a suppression motion, this Court reviews the district court's legal conclusions de novo and factual findings for clear error. *United States v. Adams*, 583 F.3d 457, 463 (6th Cir. 2009).

"When a district court has denied a motion to suppress, this Court reviews the evidence in the light most likely to support the district court's decision." *Id.* (quotations omitted). "[A] denial of a motion to suppress will be affirmed on appeal if the district court's conclusion can be justified for any reason." *United States v. Trice*, 966 F.3d 506, 512 (6th Cir. 2020) (quotations omitted).

This Court reviews for plain error "any new suppression arguments raised for the first time on appeal that were not contained in the original suppression motion will be deemed waived under Rule 12(e)." *United States v. Lopez-Medina,* 461 F.3d 724, 738 (6th Cir. 2006). Because Flores makes new arguments on appeal not contained in his original suppression motion, this Court should review those claims for plain error.

C.     Argument

1.     The police officers conducted a valid protective sweep.

In *Maryland v. Buie*, 494 U.S. 325, 334 (1990), the Supreme Court held that "arresting officers are permitted . . . to take reasonable steps to ensure their safety after, and while making, [an] arrest." The Fourth Amendment accordingly permits law enforcement to perform a protective sweep of the premises if "articulable facts . . . , taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* This type of protective sweep extends beyond in-home arrests. When officers perform an arrest immediately outside a house but reasonably suspect that they may be endangered by persons inside, they may enter the

premises to conduct a protective sweep. *See, e.g., Wilson v. Morgan*, 477 F.3d 326, 339 (6th Cir. 2007) (finding protective sweep inside home valid following arrest outside the home where "facts provide the articulable suspicion that a person possibly posing a danger still lurked in [the] residence"); *United States v. Biggs*, 70 F.3d 913, 916 (6th Cir. 1995) (holding that officers had reasonable suspicion to conduct a protective sweep of a motel room, based in part on information that another person would be meeting the defendant at the motel room).

Importantly, Flores does not challenge the district court's finding that officers were justified in entering the Priest Woods residence for a protective sweep because articulable facts supported the reasonable belief that the residence "harbor[ed] an individual posing a danger to those on the arrest scene." 3:19-cr-42, R.59, #227; *see also id.* at #228-231 (analyzing facts from which reasonable officer could infer that MS-13 members or other dangerous individuals were inside the residence). Flores also does not challenge the district court's findings that the officers located the Glock drum magazine and AR-15 in a place where a person might be found or in plain view. *Id.* at #233-235. *See United States v. Bass*, 315 F.3d 561, 564 (6th Cir. 2002) (in protective sweep, officers may conduct a cursory inspection of "spaces where a person may be found" (quotations omitted)).

On appeal, Flores attacks (Br.12-13) the downstairs portion of the sweep, stating that no testimony "indicated anyone might have been hiding on the first floor" and that it is "unclear from the record" whether officers saw the Glock drum magazine and AR-

15 before or after they arrested Hernandez and Franklin. These arguments are reviewable only for plain error because Flores did not present them to the district court. *See Lopez-Medina,* 461 F.3d at 738. The fact that Flores now complains (Br.8, 12-13) that the record is "unclear," "never fl[e]shed out . . . exactly when the AR-15 and drum magazine were found," and that more "questions need to be answered" underscores that he did not develop these specific arguments below. And Flores has not shown an error that is obvious or plain, that affects his substantial rights, or that seriously affects the fairness or integrity of the judicial proceeding.

In any event, just as the undisputed record evidence supported warrantless entry into the residence for a protective sweep, the same evidence supported the protective sweep of the first floor. Officers reasonably believed that dangerous individuals could be inside based on Flores's murder warrant, source information that Flores might be with other dangerous individuals, the conduct of one of the occupants, and the fact that the door was closed after Flores exited the residence. 3:19-cr-42, R.59, #228-231. None of those articulable facts limited the danger to the second floor, and the fact that the door was closed is a particularly strong indication that at least one other individual was inside and had been on the first floor. *Id.*

Likewise, the timing of the downstairs sweep relative to the arrests upstairs is beside the point. As the district court observed, the government did not premise its entry on "the existence of warrants for . . . the two Franklins." *Id.* at #220. There was no requirement that the protective sweep end after their arrests, and the articulable facts

supporting warrantless entry for a protective sweep did not limit the potential danger to just those two individuals. Moreover, to the extent the record is ambiguous about the sequence of events during the protective sweep, this Court views the evidence in light most favorable to the district court's decision. S*ee Adams*, 583 F.3d at 463; *see also* 3:19-cr-42, R.59, #173 (officer testifying that he was "informed at some point" about the drum magazine and AR-15).

### 2. The good-faith exception to the exclusionary rule applies.

Even assuming *arguendo* that the protective sweep violated the Fourth Amendment, suppression is not justified in these circumstances. To "supplement the [Fourth Amendment's] bare text," the Supreme Court "created the exclusionary rule, a deterrent sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231-232 (2011). But because the exclusion of reliable evidence has "'significant social costs,'" suppression of evidence "'has always been [the Supreme Court's] last resort, not [its] first impulse.'" *Utah v. Strieff*, 579 U.S. 232, 237-238 (2016) (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).

The good-faith exception to the exclusionary rule applies so long as the "facts surrounding the initial warrantless search were close enough to the line of validity to make the executing officers' belief in the validity of the search warrants objectively reasonable." *See United States v. McClain*, 444 F.3d 556, 566 (6th Cir. 2005); *see also United States v. Fugate*, 599 F. App'x 564, 567 (6th Cir. 2014) (applying good-faith exception

where probable-cause affidavit included evidence obtained from warrantless search). Here, at a minimum, police had an objectively reasonable belief that they were permitted to enter the residence to conduct a protective sweep. In these circumstances, the costly remedy of suppression does not pay its way.

## CONCLUSION

This Court should affirm the judgments of conviction.

Respectfully submitted,

ROBERT E. MCGUIRE
   Acting United States Attorney

MATTHEW R. GALEOTTI
   Supervisory Official

AHMED A. SAFEEULLAH
   Assistant United States Attorney
   Middle District of Tennessee

/s/ SOFIA M. VICKERY
SOFIA M. VICKERY
   Attorney, Appellate Section
   Criminal Division

MATTHEW K. HOFF
   Deputy Chief, Violent Crime and
   Racketeering Section,
   Criminal Division

U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Suite 1264
Washington, DC 20530
(202) 305-7408
Sofia.Vickery@usdoj.gov

Dated:     May 22, 2025

## CERTIFICATE OF COMPLIANCE

This brief contains 16,888 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). The government's motion for leave to file an oversized brief not to exceed 17,000 words (filed on May 22, 2025) is pending before the Court. This brief also complies with the typeface and type-style requirements of Fed. Rule of Appellate Procedure 32(a)(5) and 32(a)(6) because it has been prepared in 14-point Garamond, a proportionally spaced typeface, using Microsoft Word for Office 365 word processing software.

Dated:     May 22, 2025

/s/ SOFIA M. VICKERY
SOFIA M. VICKERY
Attorney, Appellate Section
Criminal Division
U.S. Department of Justice
950 Pennsylvania Ave., N.W.
Suite 1264
Washington, DC 20530
(202) 305-7408
Sofia.Vickery@usdoj.gov

# ADDENDUM

## DESIGNATION OF DISTRICT COURT DOCUMENTS

| Dkt. No. | Document | PageID # |
|----------|----------|----------|
| R.150 | Second Superseding Indictment | #404-460 |
| R.401 | Notice | #1345-1599 |
| R.465 | Order | #2126-2134 |
| R.546 | Plea Agreement | #2721-2738 |
| R.558 | Motion | |
| R.571 | Tidwell Verdict | #2783-2787 |
| R.573 | Flores Verdict | #2793-2803 |
| R.575 | Pineda-Caceres Verdict | #2815-2818 |
| R.600 | Trial Transcript | #2953-3142 |
| R.601 | Trial Transcript | #3143-3405 |
| R.602 | Trial Transcript | #3406-3655 |
| R.603 | Trial Transcript | #3656-3619 |
| R.604 | Trial Transcript | #3920-3959 |
| R.605 | Trial Transcript | #3960-4235 |
| R.606 | Trial Transcript | #4236-4439 |
| R.607 | Trial Transcript | #4440-4619 |
| R.608 | Trial Transcript | #4620-4904 |
| R.609 | Trial Transcript | #4905-5048 |
| R.610 | Trial Transcript | #5049-5331 |
| R.611 | Trial Transcript | #5332-5578 |
| R.612 | Trial Transcript | #5579-5852 |
| R.613 | Trial Transcript | #5853-6017 |
| R.614 | Trial Transcript | #6018-6193 |
| R.632 | Motion | #6304-6318 |
| R.638 | Sealed Trial Transcript | #6346-6605 |
| R.639 | Sealed Trial Transcript | #6606-6873 |
| R.640 | Sealed Trial Transcript | #6874-7027 |
| R.730 | Hearing Transcript | #7503-7570 |
| R.756 | Flores Judgment | #7687-7695 |
| R.760 | Flores Notice of Appeal | #7704 |
| R.768 | Tidwell Judgment | #7777-7785 |
| R.772 | Tidwell Notice of Appeal | #7795-7796 |
| R.773 | Pineda-Caceres Judgment | #7797-7804 |
| R.775 | Pineda-Caceres Notice of Appeal | #7810-7811 |

| The following documents are filed in case number 3:19-cr-42 (M.D. Tenn.): | | |
|---|---|---|
| R.41 | Motion | #73 |
| R.51 | Order | #115-121 |
| R.57 | Order | #133 |
| R.59 | Hearing Transcript | #137-249 |